### In Re: Petition of Wilhelm et al.

134

Argued May 1, 1933.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Arthur L. Shay,* and with him *Harold L. Paul* and *R. A. Freiler,* for appellant.

*William Wilhelm,* for appellee.

OPINION BY STADTFELD, J., December 16, 1933:

This is an appeal by George Franklin Brumm, the successful candidate for Congress, at the election held November 4, 1930, from the 13th Congressional District of Pennsylvania, at that time composed of the County of Schuylkill, from the decree of the court of quarter sessions of Schuylkill County, which entered an order under the Act of March 5, 1906, P. L. 78, as amended by the Act of the 25th of April, 1927, P. L. 367, finding, upon an audit of his account, the accountant guilty of unauthorized and illegal acts.

There are three questions raised in this appeal: (1), the right of a candidate for Congress to contribute to the treasurer of a committee for the election of a Governor of the State; (2), the right of a candidate to amend his account upon the audit thereof; and (3), the correctness of the finding by the court that the account was false in a substantial matter and the expenditures illegal.

1. In the account filed by appellant appear two items under the head of "expenditures, disbursements, etc.," "10/24—Nelson J. Clayton, Treas., watchers

and workers, $500" and "11/1—Nelson J. Clayton, Treas., watchers and workers $500." Attached to the account, according to the finding of the lower court, in the opinion by HOUCK, J., is a receipt from Nelson J. Clayton, as treasurer of Pinchot for Governor committee of Schuylkill County, dated October 24, 1930, as follows: "This is to certify receipt of the sum of $500 from Geo. F. Brumm to be used for campaign expenses." There is a similar receipt for the same amount, dated November 1, 1930, also signed by Nelson J. Clayton, as treasurer of said committee.

Under the Act of the 5th of March, 1906, P. L. ,78, P. S. 25-1009, known as the "Corrupt Practice Act," it is provided, inter alia, "Section 4. No candidate and no treasurer of any political committee, shall pay, give or lend or agree to pay, give or lend, either directly or indirectly, any money or other valuable thing for nomination or election expenses whatsoever, except for the following purposes": Then follow the purposes permitted. The Act of the 23rd of April, 1927, P. L. 367, P. S. 25-1009, has amended Sec. 4 of the Act of 1906, supra, only by eliminating "dissemination of information to the public" and substituting therefor "the rental of radio facilities," as one of the purposes permitted.

The restrictions contained in the act are intended to apply to a candidate for his own election. To further his own nomination or election, he can only pay, give or lend for the purposes mentioned in the act. As a citizen there is no question of his contribution either to a candidate or a committee. Quoting from In re Bechtel's Election Expenses, 39 Pa. Superior Ct. 292, 302, this court said: "But the persons who may make even such lawful expenditures are confined to two classes, to wit: candidates and treasurers of political committees. "The individual citizen may still lawfully give his money to aid the success of the political party or the advancement of the political

cause he deems most desirable. But he may not do this by undertaking himself the expenditure of even his own money for 'election expenses.' He must contribute it directly to a candidate or to a political committee because only through one of these two channels can it lawfully be expended even for the purposes designated in the act."

Appellant, had a clear right as an individual to contribute to the Governor himself in person, or to the treasurer of a committee formed for the purpose of promoting the election of the Governor.

In the account filed by George Franklin Brumm the purpose of these contributions is expressed as for "watchers and workers" while the receipts of Clayton, treasurer, specify that both of these contributions were "for campaign expenses."

When one contributes money either directly to a candidate or to the treasurer of a political committee, the candidate receiving the contribution or the treasurer of the committee is alone responsible for its lawful expenditure.

. These contributions of Mr. Brumm to the "Treasurer of Pinchot for Governor Committee," were entirely lawful. Out of abundant caution he duly accounted for the same in his account filed with the clerk of the court, and receipts were properly attached.

The court below was therefore in error in its conclusion of law in holding that the contributions to Nelson J. Clayton, treasurer of the "Pinchot for Governor Committee" were unauthorized and illegal expenditures. The assignment of error in relation thereto is therefore sustained.

Questions (2), the right to amend the account at the audit, and (3), the correctness of the findings of the lower court as to the legality of the expenditures, may be considered together.

At the hearing, counsel for accountant asked leave of court to amend fourteen of the items in the account,

three of which amendments were allowed, and eleven refused and which are the subjects of the assignments of error.

One item, "11/3—Joe Sobolesky, automobile $25," was asked to be amended by adding "used in traveling and traveling expenses incurred."

Six items, each of which specified payments of $5 each to a so-called "solicitor" were asked to be amended by adding "who were messengers actually employed and directed to deliver messages in the form of printed matter to the citizens in their districts before election."

The nature of the services of these "solicitors" was explained by Mr. Brumm, in his testimony as follows: "That is exactly what they are. They go from one person to another that they know and asked them to come out. Q. Was that by reason of a request from you to do it, to act as messengers, to request them to come out? A. Exactly."

The account also shows the names of six persons, designated as "watchers" to each of whom the sum of $5 was paid. These are the same parties designated as "solicitors" above referred to. Mr. Brumm's testimony in relation to these so-called watchers is as follows: "The word 'watcher' is absolutely misused there. I did not give certificates to anybody. They were workers on the street. Nine out of ten people who see the men at work around the polls, call them watchers; that is what everybody calls them. They are technically watchers, but they were not genuine watchers. They were only there to bring the vote in."

An amendment was asked as to the item "11/3 Charles Bombino, automobile $20" by adding thereto "transporting voters and auto hire in connection with traveling expenses."

An amendment was asked as to the item "11/3 Joe Sowinsky, automobile, $15," by adding "hire and traveling expenses and transportation of voters." As

to this item Mr. Brumm testified, "Joe Sowinsky is a young man who is a truck driver and lives in Mar-Lin and I hired him to carry voters over to Selzer City to vote, or New Street, whichever it was."

An amendment was asked with regard to the item "10/24 Michael O'Brien, Dis. Information," by adding "by being actually employed in carrying and distributing messages to mine workers." As to this item Mr. Brumm testified "I sent him with my speeches and a list of my accomplishments actually done as a Congressman, and he went among the miners and to some of the little local conventions and handed those out. Whatever the act says, the fact is, it was doing that very thing. He was a messenger to carry that news to the people."

An amendment was asked as to the item "11/3 Michael O'Brien, watcher and Dis. of Information," by adding "for watcher $5 and $15 for auto hire in transporting voters to the polls." As to this item Mr. Brumm testified: "Q. Will you tell us what that money was paid for? A. Almost identical to Bombino. Mike came to me and he said 'You must have an automobile, and you ought to have some cards put out there and a fellow to watch, and that includes the employment of a man to run the automobile, to help in the voting and to hand out these cards. ...... Q. There was five dollars given for that purpose? A. Yes sir; and that was bona fide. ...... Q. Was that by reason of request from you to do it, to act as messengers to request them to come out? A. Exactly. Q. And that is true of the O'Brien man, that you wanted a worker with O'Brien as well? A. Yes. Q. That he was to employ a messenger to request them to come out? A. Exactly."

The account as filed contained the names of all parties who had received money from the accountant. The amendments were evidently intended to more fully explain the items in order to show the legality of the

disbursements. There is no question as to the power of the court to permit the amendments.—See Bechtel's Election Expenses, supra.

While this court has held that the Act of 1906 is remedial and should have a liberal construction, yet as to its penal provisions which are severe in their nature, the act should be strictly construed. Bechtel's Election Expenses, supra. In the opinion in that case, the late Judge HEAD quoted with approval from the opinion in Com. v. Shaleen, 215 Pa. 595, 597: " 'There is no impropriety in putting a literal construction on a penal clause and a liberal construction on a remedial clause in the same act of parliament.' This was said by Chief Justice BEST in Short v. Hubbard, 2 Bing. 349, 9 E. C. L. 610. The same rule has frequently been applied in our own cases and only very recently by the present Chief Justice in the case of Stull v. Reber, 215 Pa. 156." The evidence of a violation of the act should be clear and specific in order to hold one guilty. The purpose of the act was to prevent fraud and corruption at elections. There was nothing in the evidence to justify a finding that appellant was guilty of any fraud or corruption. He was the candidate of both the major parties. The opposition to him was trifling. His total expenditures to secure his own election were less than four hundred dollars. In these circumstances a liberal construction of the Act of 1927, supra, would permit the inclusion of the so-called "solicitors" and "watchers" within the allowed "messengers."

There is only one item which requires special consideration, viz: The payment of "11/3 to Michael O'Brien, watcher, Dis. Information $20" which was asked to be amended by adding "for watcher $5 and $15 for auto hire in transporting voters to the polls." Michael O'Brien testified as follows: "I received twenty dollars from Frank Brumm on November 3 to pay for an automobile and watcher in the North

Ward of Saint Clair. Q. Was the watcher a regularly appointed party watcher? A. I got a certificate from the chairman; it came from the county commissioners' office. Q. The certificate came from the county commissioners' office? A. Yes sir; signed by the three county commissioners. Q. And how much was to be paid for that watcher? A. Five dollars for the watcher and fifteen dollars for the machine. Q. What was the machine to be used for? A. Bringing voters from Arnout's Addition to the North Ward. Q. Did you pay that money? A. I paid the money to a man by the name of John Yurashis, of 128 North Third Street, Saint Clair, for the transportation of voters.''

The appointment of watchers for a general election is governed by Section 23 of the Act of 10th of June, 1893, P. L. 419, as amended by the Act of the 16th of April, 1903, P. L. 213, which provides, inter alia, as follows: ''Section 23 ...... Each party which has, by its primary meeting, caucus, convention, or board, sent to the proper office, a certificate of nomination, and each group of citizens which has sent to the proper office a nomination paper, as provided in sections two and three of this act, shall be allowed three qualified electors, who must be three electors residents of the division in which they are authorized to act as watchers, in each voting place, without expense to the county; ....... Each watcher shall be provided with a certificate from the county commissioner stating his name, the names of the persons who have appointed him, and the party or policy he represents; ......''
Under this section there is no authority for the appointment by a candidate, of watchers for a general election.

Under the Act of the 5th of March, 1906, P. L. 78, known as the Corrupt Practice Act, as amended by the Act of 23rd of April, 1927, P. L. 367, it is provided, inter alia, in sec. 4 par. 6: ''No candidate, and no treasurer, of any political committee, shall pay, give

or lend, or agree to pay, give or lend, either directly or indirectly, any money or other valuable thing for any nomination or election expenses whatever, except for the following purposes: ...... Sixth: For the employment of watchers at primary meetings and elections, to the number *allowed by law* ......" (Italics supplied.)

Under the Act of the 12th of July, 1913, P. L. 719, the Uniform Primary Act, which relates only to primary elections and nomination of candidates, section 21 provides: "Each candidate shall be entitled to appoint two watchers at the primary in each election district, division or precinct, etc."

The only provisions for watchers, either at primaries or general elections, are the acts of assembly to which we have referred supra. The payment of expenses for watchers "allowed by law" are those authorized under these acts. While the candidate at the general election has no power to name or appoint watchers, the law does not forbid his paying those who have been duly named and appointed by the proper officer.

It is not our intention that the provisions of the act of assembly should in any manner be relaxed in any case where the evidence indicates fraud or corruption. The purity of the ballot is the bulwark of our form of government, and the acts of assembly in relation to elections are intended to preserve their sanctity. In the instant case, if we deduct the contribution of $1,000 to the governorship campaign, there remains only $334.25 for the expenses connected with an election to Congress in a district coextensive with the County of Schuylkill, comprising, according to the Pennsylvania Manual for 1931, 195 districts, where the candidate was a nominee on both the Republican and Democratic tickets. This amount is neither shocking to the conscience, nor, in the absence of any direct

evidence, does it give rise to any inference of fraud or corruption.

The assignments of error as to the refusal to permit amendments are sustained. With these amendments allowed, we believe that there is a full, true and detailed account of the purposes for which the money was expended, and that they do not disclose any unauthorized or illegal expenditure. The assignments of error to the findings by the court and to the final order of the court, are sustained. The record is remitted to the court below with directions to amend its findings and conclusions, and order, in accordance with this opinion. Appellant to pay costs.