**PEOPLE'S PARTY et al., Plaintiffs,**

v.

**C. Dolores TUCKER, Secretary of the Commonwealth of Pennsylvania, Defendant.**

**Civ. A. No. 72-102.**

United States District Court,
M. D. Pennsylvania.

June 7, 1972.

A. Harry Levitan, Harry Lore, Philadelphia, Pa., for plaintiffs.

Thomas J. Oravetz, Deputy Atty. Gen., J. Shane Creamer, Atty. Gen., Harrisburg, Pa., for defendant.

Before ADAMS, Circuit Judge, and NEALON and MUIR, District Judges.

## OPINION OF THE COURT

MUIR, District Judge.

The question in this case is whether the Pennsylvania Election Code violates the federal constitution. We conclude that it does.

The specific portions of the code which are attacked are those which require political bodies to secure a substantial number of signatures to nominating papers during a three-week period in the winter in order to have the names of their candidates appear on the fall ballot. A political body is, in brief, a political organization which at the last general election in Pennsylvania polled a vote of less than 2% of the largest vote cast in the state for any elected candidate. Political organizations which polled a larger vote are classified as political parties.[1] Political bodies in Pennsylvania do not use the primary election machinery for nomination of their candidates.

The amendment to the Code which precipitated this case was passed December 22, 1971.[2] It quadrupled the signature requirement on nominating papers of candidates of political bodies to 2% of the largest entire vote cast for a statewide candidate at the last general election. This year, application of the statute would require 35,624 signatures on nominating papers if the nominee of a political body is to secure a place on the fall ballot. The amendment left intact the prior requirement that these signatures be obtained in a three-week period beginning the 10th Wednesday before the primary.[3]

During the prior three-week period, candidates for political party nomination were circulating their petitions in anticipation of the primary which was held April 25, 1972. In order for a presidential candidate's name to appear on the primary ballot, he must obtain within three weeks 100 signatures in each of 10 counties. If nominated at the primary

1. 1937 P.L. 1333, § 801, as amended Dec. 22, 1971 P.L. ——, Act #165, § 2, 25 P.S. § 2831, Purdon's Pa.Legislative Service, Session of 1971, pamphlet #5, p. 634.

2. Dec. 22, 1971 P.L. ——, Act #165, § 12, effective immediately, amending § 951, sub. § (b) of the last act amended 9/11/59, P.L. 877 § 1, 25 P.S. § 2911 (b), Purdon's Pa.Legislative Service, Session of 1971, pamphlet #5, p. 638.

3. 1937 P.L. 1333 § 953(b), as amended 1963 P.L. 707 § 12, 25 P.S. § 2913(b).

by his party, the candidate's name and party designation could thus appear on the fall ballot based on nomination papers containing a minimum of 1,000 signatures, properly spaced geographically. Contrast this with an independent candidate's burden of obtaining 35,624 signatures also within a three-week period.

In 1972, three political bodies made the attempt to obtain the necessary 35,624 signatures in three weeks. Only the Communist Party succeeded.

The forms of nominating papers furnished Plaintiffs by the Defendant Secretary of the Commonwealth contained a wholly unwarranted phrase that electors signing the same "represented" the particular political body, thus adding to the obstacles placed in the path of circulators of those papers.

The Plaintiffs charge that their rights under the First and Fourteenth Amendments to the United States Constitution have been infringed by these requirements.

■■■ The essence of a democracy is the right to vote freely. Every citizen must have a full right effectively to participate in the political process. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Independent political bodies and groups legitimately are interested in having their candidates' names and independent political labels appear on the ballot at the general election and any tinkering with the electoral process which deprives them of that right will be struck down.[4] The right to appear on the ballot is protected by the First Amendment with the proviso that a state may constitutionally restrict the right by showing a compelling interest in so doing. Voters have the right under the First Amendment to associate for the advancement of political beliefs and for the effective casting

of their votes, Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and the development of new programs by independent political bodies should be encouraged. Sweezy v. N. H., 354 U.S. 234, 250–251, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). Competition at the polling place between new and old ideas is at the very heart of our political system and is guaranteed by the First Amendment. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

■■■ It is proper for the legislature to prescribe different methods of nomination for use by political bodies on the one hand and political parties on the other. But each such method must be a reasonable one. If an unreasonable requirement is imposed, the "compelling state interest" or "compelling necessity" test of Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) is not met. Of course, the Commonwealth has an interest in being assured that a candidate or political body has at least a modest amount of support before being granted ballot space. Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

■■ We do not find the number of signatures required of a political body by the Pennsylvania Election Code to be an unreasonable one. Most states have some requirement as to a minimum number of signatures for nomination papers.[5] The Georgia statute requires that signatures of 5% of the total of all registered voters be obtained on nomination papers over a six-month period. This was held valid in Jenness v. Fortson.[6] The requirement in our case of 2% of the largest vote cast for any elected candidate in the state obviously calls for a lesser number of signatures than 5% of the registered voters in the state.

4.  United Ossining Party v. Hayduk, 166 N. Y.Law Journal No. 69, 10/7/71, p. 1 (S.D.N.Y. 9/27/71).

5.  Justice Harlan lists 42 such states in his concurring opinion in Williams v.

Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (1968).

6.  Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

We have carefully read and reread Jenness. In our view, this case differs from Jenness in several material aspects. In Jenness, a Georgia elector need not indicate support for the political body whose solicitors circulate the petitions, and may sign as many nominating petitions as he wishes in a 26-week period ending in early June. In our case, the Pennsylvania elector must certify that he "represents" the political body and may sign only one nominating petition in a three-week period ending in early March.

The Pennsylvania Election Code is in general an exceptionally well considered statute and the defect complained of here is the first serious flaw in the statute which has come to our attention. We are most reluctant to declare a state act unconstitutional, whether in whole or in part, unless the surrounding circumstances require such a result.

Where is the compelling necessity that in excess of 35,000 signatures be obtained in Pennsylvania on behalf of a candidate in a three-week period beginning 265 days before the election at which his name appears for the first time thereafter on the ballot?

We conclude that this three-week period is so short and so remote from the election as to be unreasonable. We have been unable to ascertain any valid purpose to be served by it.

The three-week requirement is suffocating and effectively blocks access to the ballot by all but the most disciplined of minority political organizations. It freezes the status quo and reduces the voters' choice to a bare minimum.

The presumption favoring the constitutionality of legislation is in this case outbalanced by the weight which must be accorded to the First and Fourteenth Amendment rights of the Plaintiffs and the class which they represent. Thomas v. Collins, 323 U.S. 516, 529–530, 65 S. Ct. 315, 89 L.Ed. 430 (1945). United Ossining Party v. Hayduk, —— F.Supp. ——, 166 N.Y.Law Journal No. 69, 10/7/71, p. 1 (S.D.N.Y.1971). With re-spect to the three-week provision, we find no compelling state interest as required by Williams v. Rhodes, 393 U.S. 23, 89 S. Ct. 5, 21 L.Ed.2d 24 (1968) nor a reasonable basis. An injunction is warranted restraining the enforcement of 1937 P.L. 1333 § 953(b), as amended, 1963 P.L. 707 § 12, 25 P.S. § 2913(b), insofar as it would render any candidate ineligible to receive the nomination of any of the Plaintiffs with respect to the election scheduled for November 7, 1972.

We anticipate that the Pennsylvania legislature will enact a new and reasonable provision for circulation of nominating papers by political bodies in years subsequent to 1972. If it does not do so, persons aggrieved in the future may apply to this Court for relief.

The foregoing shall constitute our findings of fact and conclusions of law under F.R.Civ.P. 52(a).

An appropriate order will be entered.

NEALON, District Judge (dissenting):

I respectfully dissent.

In order to obtain a ballot position in Pennsylvania in 1968, a "political body" needed the signatures of only one-half of one percentum of the highest vote cast for any statewide candidate at the last preceding election; all other nominations (not statewide) required 2 per cent of the largest entire vote cast for any officer elected at the last preceding election in the electoral district for which the nomination papers were to be filed. In the 1968 election there were eight parties on the Pennsylvania ballot: Democratic, Republican, American Independent, Peace and Freedom, Constitutional, Socialist Labor, Militant Workers and Youngmen. Of the 4,748,000 Presidential votes cast, 4,728,000 went to only three candidates. Among the remaining five parties on the ballot, the largest vote received was 7,821. Furthermore, Pennsylvania uses voting machines, of which there are 15,000 in use in 40 of the State's 67 counties, and the remaining counties use paper ballots. The "Shoup" voting machine is used exclu-

sively in Philadelphia, while the "Jamestown" machine is used in other parts of the State. Each machine has space for 9 political parties.

On December 22, 1971, Section 951 was amended and the one-half of one per centum signature requirement was raised to two percentum. This amendment forms the basis for Plaintiffs' lawsuit.

In Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971), Mr. Justice Stewart, speaking for the Court, pointed out that ". . . (t)here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization and its candidates on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." In light of the trivial showing made by five "political bodies" in the 1968 election, the danger of confusion, deception, and frustration in having a proliferation of parties and candidates on the ballot, and the mechanical and administrative problems posed by the space limitations of voting machines, I think it was entirely reasonable for the Pennsylvania Legislature, in furtherance of this important state interest, to raise the number of required

signatures from one-half of one per centum to two per centum.

Pennsylvania's Election Calendar establishes a complete detailed and logical timetable under which all candidates of a "political party" must be identified and have nominating petitions filed by February 15, 1972, and all candidates of a "political body" must be identified and have nomination papers filed by March 8, 1972. The Primary Election was held April 25, 1972. A petition contesting the nomination of any candidate must be filed by May 15, 1972. Candidates nominated at the Primary or by nomination papers have until August 14, 1972 to withdraw. Substituted nomination certificates must be filed by August 24, 1972. So long as a Spring Primary Election date is prescribed, I see nothing unreasonable in requiring all candidates to identify themselves at approximately the same time and to follow the same calendar.[1] The question remains whether the new requirement that 35,624 signatures be obtained in the twenty-one day period between February 16, 1972, and March 8, 1972,[2] infringes upon Plaintiffs' First Amendment rights.[3] I am of the opinion that it does not.

It is my position that before the Court decides whether Pennsylvania has demonstrated a "compelling state interest" in enacting certain provisions of

1. There may very well be an equal protection argument in reverse if Plaintiffs are to be allowed to file not only long after party candidates have filed, but also after the Primary Election is held and party candidates chosen.

2. While the signatures must be affixed in the course of the twenty-one days, Pennsylvania has placed no restriction on Plaintiffs' political activity prior to that time and, indeed, any candidate may solicit promises of signatures for his petition well before the permissible time for actual signatures. See Moore v. Board of Elections for District of Columbia, 319 F. Supp. 437 (D.D.C.1970).

3. Plaintiffs' equal protection argument was not strenuously asserted and, even if it were, it would fall as a similar argument fell in Jenness v. Fortson, 403 U.S. 431, 440, 441, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). In Jenness (supra) it was held that Georgia's request that the candidate of a "political body" must gather the signatures of 5% of the total eligible electorate in order to obtain a place on the General Election ballot was not inherently more burdensome than winning the votes of a majority in a party primary. Similarly, Pennsylvania's request that a candidate, in order to qualify for the main event of the election contest, i. e., the General Election, must obtain signatures of 2% of the highest vote previously cast for a statewide candidate within a 21-day period is not inherently more burdensome than winning the votes of a majority in a party primary. See also Lyons v. Davoren, 402 F.2d 890 (1st Cir. 1968); cert. denied 393 U.S. 1081, 89 S.Ct. 861, 21 L.Ed.2d 774 (1969).

the Election Code, it must initially determine whether Plaintiffs' First Amendment rights have been violated.[4] Certainly, a state cannot be accused of interfering with First Amendment rights by refusing to grant ballot position unqualifiedly to every individual who decides to aspire for high State or Federal office. In *Jenness*, supra, decided without dissent, the Court stated "(w)e can find in this system [Georgia's] nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments." By way of comparison, Georgia's signature requirement of 5% of the total electorate obtained over a period of 180 days, if applied in Pennsylvania, would necessitate securing 270,000 signatures (5% of 5,400,000) at the rate of 1500 per day, as contrasted with the present requirement of 36,000 at the rate of 1700 per day. This would require a Pennsylvania political body to obtain approximately eight times as many signatures at a relatively insignificantly lower rate per day. The 36,000-signature requirement, therefore, represents .67 per cent of the Pennsylvania registered voters, far less than the Georgia 5 per cent requirement.

As in *Jenness*, supra, independent candidates and members of small or newly formed political organizations in Pennsylvania are wholly free to associate, to proselytize, to speak, to write and to organize campaigns for any school of thought they wish, or they may confine themselves to an appeal for write-in votes. Unlike Georgia where an organization's candidate must receive 20% or more of the vote at the most recent gubernatorial or presidential election in order to qualify as a "political party", Pennsylvania requires but 2% of the largest entire vote cast for any elected candidate in the State at large at the last preceding election at which statewide candidates were voted for. Unlike Georgia where a political body must meet the same deadline as that of a candidate filing in a party primary, Pennsylvania allows the filing of a political body's petition three weeks later than that fixed for candidates filing in a party primary. As pointed out in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24 (1968), and reaffirmed in *Jenness*, supra, we must look to the totality of the Election laws as a whole to determine whether in combination they made it virtually impossible for a new political organization to be placed on the state ballot or whether it places heavy burdens on or effectively suffocates First Amendment rights.[5] Offsetting these more generous sections of the Pennsylvania Election Code, Georgia has a later Primary Election date and allows a registered voter to sign as many nominating petitions as he wishes.[6] This is probably why we are commanded to view

---

4. It is not altogether clear that the proper standard of review in First Amendment cases is the compelling state interest test. *Compare* Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) *with* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 488 (1958). However, for the purpose of analysis, I will assume that the stricter standard of a compelling justification is applicable. *See* The Supreme Court, 1968 Term, 83 Harv.L.Rev. 86, 93 (1969). Although First Amendment rights were considered in Jenness, supra, the Court's opinion makes no reference to a "compelling state interest" but did allude to "an important state interest".

5. The fact that the Communist Party was able to obtain substantially more than the required number of signatures within the twenty-one day period, dilutes any argument of "virtual impossibility" or "effective suffocation".

6. Yet, in my view, this is the wiser of the two legislative provisions. If all signatories were free to sign as many nominating petitions as they desired, it would be entirely possible that the same 36,000 people could nominate an unlimited number of candidates. Pennsylvania has seen fit to eliminate this possibility by allowing an individual to sign but one petition, a provision which is not only fair, but may be required under the one-man, one-vote mandate established in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and its progeny. *Cf.* Jackson v. Ogilvie, 325 F.

the totality of a State's election laws, as the specific rights and obligations provided therein will vary in each State. To me, the differences between the Georgia and Pennsylvania statutes are insignificant in the totality of the election laws and are balanced out in the final analysis.

The Court decided in *Jenness*, supra, that Georgia did not freeze the status quo, imposed no suffocating restrictions whatever upon the free circulation of nominating petitions, and insulated not a single potential voter from the appeal of new political voices within its borders. From this the conclusion was reached that First and Fourteenth Amendment rights were not abridged.[7] I would apply the same language to Pennsylvania and would deny relief to Plaintiffs.

Supp. 864 (N.D.Ill.), aff'd, 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971).

7. *See also* Jackson v. Ogilvie, 325 F.Supp. 864, *supra*, aff'd. 403 U.S. 925, 91 S.Ct.

2247, 29 L.Ed.2d 705 (1971); Beller v. Kirk, 328 F.Supp. 485 (S.D.Fla.1970), aff'd. sub nom. Beller v. Askew, 403 U.S. 925, 91 S.Ct. 2248, 29 L.Ed.2d 705 (1971).