387 A.2d 85

**COMMONWEALTH of Pennsylvania**

v.

**Robert SUPLEE and James R. Hanlon.**

**Appeal of Robert SUPLEE.**

Superior Court of Pennsylvania.

Argued Sept. 14, 1976.

Decided April 13, 1978.

Patrick W. Kittredge, Philadelphia, for appellant.

D. Michael Emuryan, Assistant District Attorney, Media, with him Ralph B. D'Iorio, Assistant District Attorney, Media, for Com., appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

Appellant was convicted of violating § 3234 of the Pennsylvania Election Code.[1]  On this appeal he contends that the lower court should have granted his motion in arrest of judgment because the statute under which he was convicted does not apply to his conduct, namely, placing an advertisement in reply to an opponent's advertisement without first giving notice to the opponent.  We agree and therefore reverse.[2]

Appellant was Chairman of the Committee to Elect James R. Hanlon, Republican candidate for Township Supervisor of Upper Providence, Pennsylvania, in an election scheduled for November 4, 1975.  On Wednesday, October 29, 1975, supporters of the Democratic candidate, Larry D'Antonio, ran an advertisement critical of Hanlon in Towntalk Newspaper, a weekly publication.  No prior notice was given to Hanlon that this advertisement was to be run.

1. Act of June 3, 1937, P.L. 1333, art. XVI, § 1614, added 1972, Dec. 28, P.L. 1658, No. 353, § 1; 25 P.S. § 3234 (Supp.1977–78).

2. Because we reverse on a statutory construction ground we need not reach appellant's constitutional argument.

On the day that the advertisement appeared, Hanlon authorized his Committee to run an advertisement in reply. This reply advertisement[3] was placed with the Delaware County Daily Times on Friday, October 31, and was run on Monday, November 3, without prior notice to D'Antonio.

A week after the election, one of D'Antonio's supporters filed a private criminal complaint charging that by failing to notify D'Antonio of the reply advertisement before it was published Hanlon and appellant had violated § 3234. Following a finding of guilt in a summary proceeding before a District Magistrate, appellant took an appeal to the Delaware County Court of Common Pleas. The case was submitted on stipulated facts, and on April 9, 1976, the lower court found appellant guilty as charged. Post-verdict motions were denied, and appellant was sentenced to pay a fine of $1.00 and costs of prosecution. This appeal followed.

§ 3234 of the Election Code provides, in pertinent part:

(a) No candidate for public office, . . . or party acting on his behalf, shall place any advertisement referring to an opposing candidate . . . to be . . . published during the forty-eight hours immediately prior to an election or published in a weekly newspaper or periodical during the eight days immediately prior to an election . . . unless he has first given a copy . . and reasonable notice to the opposing candidate and the County Board of Elections . . . in sufficient time for a reply advertisement to be published . . . at the same approximate time or in the same issue of the publication . . . as the original advertisement and prior to the election. . . .

(b) The reasonable notice referred to in subsection (a) . . . shall be given in writing by registered mail . . . . .

Thus, the Code contemplates three steps: 1) the preparation of an "advertisement"; 2) registered mail notice "to the

3. Although the Commonwealth makes a brief argument to the contrary, it appears to accept the fact that Hanlon's advertisement was a reply to D'Antonio's.

opposing candidate"; and 3) delivery of the notice "in sufficient time for a reply advertisement to be published . . . at the same approximate time or in the same issue of the publication . . . as the original advertisement and prior to the election." It is only notice of the "advertisement" that is required.

The purpose of requiring notice of the advertisement is to enable an opposing candidate to prepare and have published a reply advertisement. To read "advertisement" and "reply advertisement" as meaning the same thing, as the lower court did, would create a procedure that a candidate might not be able to comply with, and that in any case would be contrary to the purpose of the statute.

Suppose A is running against B. On Saturday, four days before election, A sends B registered mail notice of an advertisement to run on Monday (*i. e.,* "during the forty-eight hours immediately prior to [the] election"). B receives the notice on Monday, just in time to prepare his reply advertisement to run in later editions of the Monday paper (*i. e.,* "at the same approximate time or in the same issue of the publication . . . as the original advertisement"). However, according to the lower court's reading of the statute, before B may run his reply he must send A notice of his intent to do so. B obeys subsection (b)[4] and sends this notice by registered mail; A will receive it on Tuesday at the earliest, which will be too late for A to run a reply to B's reply "at the same approximate time or in the same issue of the publication . . . as the original advertisement and prior to the election."

Thus, the difficulty with the lower court's reading of the statute is that it envisions an infinite series of notices and counter-notices, whereas the statute envisions a finite series, limited by the terminus of Election Day. The consequence of requiring a series of notices and counter-notices would be

---

4. We might assume that subsection (b) sets only a minimum, and that B could avoid timing difficulties by serving A personally with notice of his intent to reply. Even so, sooner or later, an insoluble difficulty would appear.

to present B with an unpleasant choice: either to run his reply on Monday and face criminal penalties, or to refrain from running it. Both alternatives would be contrary to the intent of the statute, which is to ensure that a candidate in B's position has an opportunity to reply to A's advertisement. In these circumstances, we are guided by § 1922 of the Statutory Construction Act,[5] which states, in pertinent part:

In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used:

(1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.

.    .    .    .    .

The judgment of sentence is vacated, and appellant discharged.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

HOFFMAN, J., files a concurring opinion in which CERCONE, J., joins in Part I.

CERCONE, J., joins in the opinion as well as Part I of HOFFMAN, J.'s concurring opinion.

VAN der VOORT, J., concurs in the result.

HOFFMAN, Judge, concurring:

Appellant contends that the lower court erred in refusing to grant his motion in arrest of judgment for a violation of § 3234 of the Pennsylvania Election Code[1] because the

5. Act of Nov. 25, 1970, P.L. 707, No. 230, added Dec. 6, 1972, P.L. 1339, No. 290, § 3, effective immediately; 1 Pa.C.S. § 1922 (App. 1977).

1. Act of June 3, 1937, P.L. 1333, art. XVI, § 1614, added 1972, P.L. 1658, No. 353, § 1; 25 P.S. § 3234 (Supp.1977–78) provides:

"(a) No candidate for public office, or political committee or party acting on his behalf, shall place any advertisement referring to an opposing candidate for the same office which is to be broadcast or published during the forty-eight hours immediately prior to an elec-

terms of the statute do not proscribe his conduct and because the statute unconstitutionally restricts his First Amendment rights. I agree and, therefore, concur.

The parties stipulated to the following facts. On Novemwas to hold elections for Township Supervisor. James R. was to hold elections for Township Supervisor, James R. Hanlon was the Republican candidate for Supervisor and appellant was the Chairman of the Committee to Elect James R. Hanlon. Larry D'Antonio, the Democratic candidate for Supervisor, was Hanlon's opponent. On Wednesday, October 29, 1975, certain supporters of D'Antonio, un-

tion or published in a weekly newspaper or periodical during the eight days immediately prior to an election, with a television or radio broadcasting station, newspaper or periodical, unless he has first given a copy of the material to appear or be used in the advertisement and reasonable notice to the opposing candidate and the County Board of Elections of the county where the advertisement is to be placed in sufficient time for a reply advertisement to be published or broadcast at the same approximate time or in the same issue of the publication or on the same radio or television broadcast as the original advertisement and prior to the election in question.

"(b) The reasonable notice referred to in subsection (a) of this section shall be given in writing by registered mail, return receipt requested, addressee signature only, with a true copy of the material enclosed to appear or be used in the advertisement so as to afford the recipient sufficient time to place a reply advertisement to be published or broadcast at the same approximate time or in the same issue of the publication or on the same radio or television broadcast as the original advertisement and prior to the election in question.

"(c) Any person, firm or corporation, political committee or party or member thereof, violating any of the provisions of this section shall, upon summary conviction, be sentenced to pay a fine not exceeding three hundred dollars ($300) and costs of prosecution and, in default of the payment thereof, shall be sentenced to undergo imprisonment for not more than thirty (30) days."

der the name of Republicans for D'Antonio, placed a commercial advertisement in Towntalk newspaper,[2] a weekly

2.

# REPUBLICANS

### UPPER PROVIDENCE VOTERS — PULL LEVER 15A
### SUPPORT LARRY D'ANTONIO FOR SUPERVISOR

## THE MYTHS, FACTS, AND REALITIES OF THIS ELECTION

**BUILDING CODE LAW SUIT:**

**MYTH** . . . . . . . *Mr. Hanlon's statement that "Judge Toal can put me in jail" has surface popularity, but will not stop the lawsuit.*

**FACT** . . . . . . . *Upper Providence citizens are being sued for One Million Dollars in damages because of James R. Hanlon's recalcitrance.*
*The Township Building Code is in reality an Ordinance Without Teeth! When the Township seeks to enforce the Building Code against a builder, it must do so in accordance with the principle of due process of law. Under our system of justice, due process is what the Courts say it is, and NOT what Mr. Hanlon says it is.*
*Resident homeowners and builders alike, want balanced development in the Township and a code that specifies the rights and duties of all concerned.*

**REALITY** . . . . *Political expediency is expensive, and it does not solve the need for a meaningful Building Code. It also does not allow for balanced development of Upper Providence Township.*

**BUDGET PROBLEMS:**

**MYTH** . . . . . . . *Mr. Hanlon says the Township will have a budget surplus and will avoid any increase in taxes.*

**FACT** . . . . . . . *There will be a 1975 deficit in the budget. This is called Deficit Spending! Increased taxes, Township borrowing, or continued depletion of assets are the only solutions open to balance the Township budget.*

**REALITY** . . . . . *A 10 mill tax increase will be required to offset the deficit and balance the budget as required by law. Only a taxpayer lawsuit can prevent any further withdrawals or depletions of encumbered Township assets.*

**SEWER TAX PROBLEM:**

**MYTH** . . . . . . . *Mr. Hanlon's message of "Improved Fiscal Accountablility" claims users are receiving a lower sewer rate.*

**FACT** . . . . . . . *In the fiscal year, 1974, a transfer of '20,000.00 was made from the escrow Sewer Account to the General Fund to help offset a budget deficit. One portion of this transfer occurred during the first three months of the 1974 fiscal year in violation of the Second Class Township Code.*

**REALITY** . . . . . *All sewer users who will check their bills for the last two years will find a large increase inspite of Mr. Hanlon's statement that "Sewer Rates Are Cheaper".*
*In reality, sewer users are subsidizing the General Fund.*

### MESSAGE

*Republicans give your support and vote to the new County Republican Team.*
*Township Voters, .support Dewey LaRosa for District Judge and Evelyn Gay for Auditor.*
*Voters permit our Supervisors to govern in the interest of ALL the residents of our Township.*
*Vote LARRY D'ANTONIO FOR SUPERVISOR!*
*Pull the Big 2nd Lever. The PUSH UP KEY 15B -- PULL DOWN KEY 15A*
*-- ELECT D'ANTONIO SUPERVISOR!*

Paid for by Republicans for D'Antonio Committee Cal Reed & Bob Stahl - Co-Chairmen

publication, without notifying Hanlon. The advertisement specifically referred to statements of candidate Hanlon and urged support for D'Antonio. In addition, the advertisement stated that "Republicans for D'Antonio Committee" had paid for it. On the same day that the above advertisement appeared, Hanlon authorized his Committee to print a reply advertisement which it placed with the Delaware County Daily Times on Friday, October 31, 1975,[3] and which appeared on Monday, November 3, 1975.

3.

## UPPER PROVIDENCE VOTERS

A statement from your

## SUPERVISOR
## JAMES R. HANLON

A statement has been issued on township fiscal matters by supporters of the Democratic candidate.

1. They claim there will be a deficit this year requiring a 10-mill increase. This statement insults the intelligence of the voter. The entire township millage is now 11 mills and to suggest there will be almost a 100 per cent deficit is ludicrous. Actually, there will be a modest surplus at the end of the year. The township has not borrowed and will not borrow. Their statement indicates a lack of knowledge of the township.

2. They mention a $20,000 transfer to the general fund in 1974. It is standard, good fiscal practice to borrow temporarily from one fund until real estate taxes come in for the general fund. The alternative would be borrowing from a bank and paying interest.

3. They state that monies have been drawn from escrow accounts. This shows their lack of knowledge and intent to deceive. The township has no escrow accounts.

4. They claim there were withdrawals from time accounts. Again they lack financial understanding. When revenues such as the real estate taxes are received they are deposited into time accounts to earn interest. Later they are transferred into checking accounts to pay current operating expenses. To deposit revenues directly into checking accounts would be foolish and a waste of taxpayers money.

Finally, let me state that the township's books were audited by the auditors in February 1975 and a full report was filed with and approved by the Democratic administration in Harrisburg.

## PULL LEVER 15B
## JAMES R. HANLON, INCUMBENT
for SUPERVISOR

(Paid For By Republicans For J. R. Hanlon)

The reply advertisement, entitled "A Statement From Your Supervisor, James R. Hanlon," discussed the Democratic candidate's claims regarding fiscal affairs in the Township. Although the reply advertisement appeared within the 48 hour period before the election, Hanlon's Committee did not give prior notice of the reply to Hanlon's opponent.

One week after the election, one of D'Antonio's supporters filed a private criminal complaint alleging that Hanlon and appellant had violated § 3234 of the Election Code by failing to notify D'Antonio of the placement of the reply advertisement before the date of its publication. After a hearing in December, 1975, a District Magistrate found appellant guilty. Appellant filed an appeal with the Common Pleas Court of Delaware County; the parties submitted the case upon a stipulated set of facts. On April 9, 1976, the lower court found appellant guilty of violating the Election Code and following the denial of post-verdict motions, sentenced him to pay $1.00 and the costs of prosecution. This appeal followed.

## I

Appellant's first contention is that § 3234 of the Election Code does not apply to reply advertisements. I agree. By its own terms, § 3234 is a penal statute.[4] Our courts have long recognized that we must construe penal statutes strictly to avoid the inclusion of otherwise lawful acts not within the statute's plain meaning. *Commonwealth v. Glover*, 397 Pa. 543, 156 A.2d 114 (1960); *Commonwealth v. Teada*, 235 Pa.Super. 438, 344 A.2d 682 (1975); Pennsylvania Statutory Construction Act, Act of November 25, 1970, P.L. 707, No. 230, added December 6, 1972, No. 290, § 3; 1 Pa.C.S. § 1928(b). Moreover, our courts have held that while remedial portions of election laws require liberal interpretation in order to effectuate the legislature's intent, we must narrowly construe the penal provisions of such statutes. *In re Petition of Wilhelm*, 111 Pa.Super. 133, 169 A. 456 (1933); *In re Bechtel's Election Expenses*, 39 Pa.Super. 292 (1909). *See also, Laub's Expense Account*, 145 Pa.Super. 513, 21 A.2d 575 (1941) (Dissenting Opinion by BARTHOLD, J.). Finally, our courts are obliged to construe strictly statutes that regulate the First Amendment rights of expression and

---

4. See 25 P.S. § 3234(c) supra. The statute is clearly penal in character. *See* Pa.R.Crim.P. 3(k), 19 P.S. Appendix. *See also Lower Merion Township v. Schenck*, 247 Pa.Super. 494, 372 A.2d 934 (1977).

association. *Buckley v. Valeo*, 424 U.S. 1, 196 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Main Road v. Aytch*, 522 F.2d 1080 (3d Cir. 1975); *People's Party v. Tucker*, 347 F.Supp. 1 (M.D.Pa. 1972); *Corporation of Haverford College v. Reeher*, 329 F.Supp. 1196 (E.D.Pa.1971); *William Goldman Theatres v. Dana*, 405 Pa. 83, 173 A.2d 59 (1961); cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).

In the instant case, the challenged election statute is clearly penal and forbids the placement of political advertisements within 48 hours of an election unless notice is sent to the candidate's opponent. Further, the statute provides for summary conviction and possible imprisonment. Section 3234 refers only to initial advertisements and does not explicitly include *reply* advertisements within its prohibition.

Appellant's statutory contention also focuses on the legislature's intent in enacting § 3234. As appellant observes, the conceded purpose of the statute is to provide an opportunity for the candidate mentioned in the first advertisement to reply to last minute scurrilous attacks. Because the statute contemplates a reply,[5] it would further no practical purpose to require notice of that reply. On the contrary, compliance with such a requirement might actually result in perpetual frustration of the legislature's intent. Thus, each candidate might attempt to be the last person publishing the last possible advertisement for which notice could be given in order to prevent an opponent from giving notice and publishing a reply within the prohibited 48 hour period. Consequently, political debate might be abruptly curtailed at the most crucial point in the election process. Because the

5. 25 P.S. § 3234(a) provides that notice must be given: ". . . in sufficient time for a reply advertisement to be published or broadcast at the same approximate time or in the same issue of the publication or on the same radio or television broadcast as the original advertisement and prior to the election in question."

25 P.S. § 3234(b) provides that notice must be given: ". . . so as to afford the recipient sufficient time to place a reply advertisement to be published or broadcast at the same approximate time or in the same issue of the publication or on the same radio or television broadcast as the original advertisement and prior to the election in question."

legislature could not have intended such a stifling result and because our courts cannot broadly interpret a penal statute, I believe that § 3234 does not require notice of publication of reply advertisements.

## II

Appellant's second contention is that § 3234 is unconstitutionally vague and thus discourages the exercise of First Amendment rights. Assuming that the statute includes reply advertisements within its prohibition, § 3234 is, nevertheless, an unconstitutional infringement of First Amendment right. By conditioning the placement of political advertisements within the last 48 hours of an election on proper notice, the statute discourages political advertisements and criminally penalizes that form of protected First Amendment activity.

The First Amendment freedoms of expression and association have long occupied a protected position in our jurisprudence. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Mills v. State of Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); *N.Y. Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Whatever the explanation for the ascendancy of the First Amendment protection, courts have remained particularly sensitive to government regulation that tends to impinge on expressive freedom." *Alderman v. Philadelphia Housing Authority*, 496 F.2d 164, 168 (3d Cir. 1974), cert. denied, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). Consequently, the courts strictly scrutinize statutes regulating First Amendment rights by requiring the state to satisfy a more rigid standard of justification for such legislation than for statutes regulating economic activity. *William Goldman Theatres v. Dana*, supra. In order to sustain a statute regulating First Amendment rights, the courts require the state to prove a compelling governmental interest that cannot be effectuated by a less drastic alternative. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *N.A.A.C.P. v.*

*Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Dana*, supra; *Commonwealth v. Feigenbaum*, 166 Pa.Super. 120, 70 A.2d 389 (1950).

Despite the special status afforded the First Amendment the U.S. Supreme Court has found compelling justifications supporting statutes regulating First Amendment rights when the state had a valid interest in safeguarding the public order,[6] regulating the use of public streets,[7] controlling sensitive, non-traditional public areas such as prisons,[8] limiting the use of fighting words,[9] and protecting sensitive audiences.[10]   However, because the state interest must be compelling, mere administrative convenience will not provide a sufficient governmental rationale.  Moreover, in addition to proving a compelling need for the legislation, the state must demonstrate the absence of a less drastic alternative to further its purpose.

In the instant case, the Commonwealth has presented no compelling state interest to justify the statute's regulation of First Amendment rights.  I can conceive of only two possible state interests: (1) preventing last minute scurrilous attacks on a political opponent who has no opportunity to reply, and (2) attempting to protect the electorate from exposure to possibly unsubstantiated and confusing charges.

The first possible state interest, protecting the reputation of candidates for public office is clearly not a compelling state interest.  In *N.Y. Times Co. v. Sullivan*, supra, the Supreme Court recognized the importance of vigorous politi-

6.  *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Schenk v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

7.  *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

8.  *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

9.  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

10.  *Rowan v. Post Office Dept.*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

cal debate, including sharp criticism of official conduct. The Court reasoned that because such expression is so critical to our democratic form of government, "neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct." *N.Y. Times Co. v. Sullivan,* supra, 376 U.S. at 273, 84 S.Ct. at 722. Further, the court recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan,* supra, 376 U.S. at 270, 84 S.Ct., at 721. Consequently, the Court concluded that the First Amendment prohibits a public official from recovering damages for defamation regarding his official conduct, absent proof that the defamatory statement was made with knowledge of its falsity or reckless disregard of its truth or falsity.

Subsequently, the Court elaborated this view by recognizing that, unlike private individuals, public officials and public figures require less protection from defamatory statements because they "voluntarily expose[d] themselves to the increased risk of injury from defamatory falsehoods concerning them." *Gertz v. Welch,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), and can counter such charges more effectively because of their greater access to the media. Consequently, they are less vulnerable to injury and less deserving of recovery than private individuals. See *Gertz,* supra. *See also, Curtis Publishing Co. v. Butts* and *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Thus, there is no compelling Commonwealth interest in protecting the reputation of political candidates.

Secondly, attempting to protect the electorate from exposure to unsubstantiated charges is an equally uncompelling state interest. Thus, in *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council,* supra, the Supreme Court rejected the argument that Virginia's statute prohibiting pharmacists from advertising drug prices protected the

public from false information. There could be no compelling state interest, the Court reasoned, when "the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance." 425 U.S. at 769, 96 S.Ct. at 1829.

Moreover, the First Amendment affords special protection to *political* expression in order to "assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Consequently, the First Amendment also protects political association. *Buckley v. Valeo,* supra. Nevertheless, the courts have sustained regulations limiting the exercise of First Amendment rights within the context of the electoral process when compelling state interests justify such legislation. The courts have found such compelling governmental interests when the statute in question seeks to eliminate bribery and corruption in election,[11] maintain the integrity of the ballot,[12] avoid intra-party raiding,[13] and prevent political pressure on government employees.[14] However, absent a compelling rationale, the regulation will not withstand judicial scrutiny. Consequently, in *Mills v. Alabama,* supra, the Supreme Court invalidated a statute providing criminal penalties for the publication of newspaper editorials on election day urging the public to vote a certain way on electoral issues. The Court rejected the state's rationale that the restraint was reasonable, minor, and beneficial because it protected the public from confusing last minute changes. Rather, the Court found the statute to be an impermissible violation of the First Amendment's protection of "discussion of candi-

11. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

12. *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

13. *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973).

14. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Civil Service Comm'n v. Letter Carriers,* 413 U.S. 458, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

dates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills*, supra, 384 U.S. 218–19, 86 S.Ct. 1437.

Similarly, in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) a unanimous Supreme Court held unconstitutional Florida's law imposing upon newspapers an obligation to grant political candidates the right to reply to editorials attacking the candidate's character. Although the Court recognised the desirability of a responsible press, the Court reasoned that press responsibility cannot be legislated by governmental intrusion into the editorial process.

In the instant case, as in *Mills*, supra, and *Miami Herald*, supra, the asserted state purpose for limiting political expression is not compelling and is equally violative of the First Amendment. Although § 3234 regulates political *advertisements*, as opposed to political editorials as in *Mills*, supra, and *Miami Herald*, supra, this does not in any way dilute the First Amendment protections afforded such expression. The courts have "never suggested that the dependence of a communication on the expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment." *Buckley*, supra, 96 S.Ct. at 633. See also *N.Y. Times Co. v. Sullivan*, supra. Finally, while a correctly and fully informed electorate, like a responsible press, is a desirable goal, the state may not legislate an objectively informed electorate by burdening the exercise of First Amendment rights. Because no compelling state interest supports § 3234's regulation of First Amendment rights, there is no need to determine whether a less restrictive alternative would have effectuated the Commonwealth's purpose. Without a compelling state interest as a justification, the Commonwealth's purpose in the regulation is unconstitutional.

I find that § 3234 of the Election Code does not prohibit reply advertisements and that the statute is an unconstitu-

tional regulation of First Amendment rights. Accordingly, I concur and would vacate appellant's sentence.

CERCONE, J., joins part I of this concurring opinion.