**MAIN ROAD, an unincorporated association, by Grady Dyches, et al.**

**v.**

**Louis S. AYTCH, Superintendent, Philadelphia Prisons.**

**Appeal of Franklyn X. PRILLERMAN et al.**

**No. 75–1010.**

United States Court of Appeals, Third Circuit.

Argued May 13, 1975.

Decided Aug. 12, 1975.

1082

Claudia Kapustin, Asst. City Sol., James M. Penny, Jr., Asst. City Sol., Raymond Kitty, Deputy City Sol., Sheldon L. Albert, City Sol., for appellee.

Theodore Clattenburg, Jr., Elliot B. Platt, Community Legal Services, Inc., Philadelphia, Pa., for appellants.

Before ADAMS, ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

On this appeal the principal issues pressed concern the constitutional right

of freedom of speech enjoyed by persons incarcerated in an institution where a majority of the prisoners are unconvicted persons held pending trial.

The first question is whether a prison superintendent may preclude prisoners in such institutions from having face-to-face contact with the press because of the ideas which the prisoners intend to express. The second matter to be resolved is whether a prison administrator, if he does not ban all interviews with the press, must follow written standards in selectively forbidding such meetings with the press. Finally, we must decide whether the prisoners are constitutionally entitled to an administrative review of decisions prohibiting specific discussions with the press.

## I.

This class action, based on the Civil Rights Act, Section 1983, was initiated on behalf of all prisoners confined in the Philadelphia prison system. It alleges that Louis Aytch, the superintendent of the Philadelphia prisons, has denied the inmates under his supervision constitutionally protected freedom of speech by the manner in which he has restricted their ability to have individual interviews [1] with the members of the news media and by the manner in which he has restrained the residents of the city's prisons from holding press conferences.[2]

Plaintiffs are individuals incarcerated in the Philadelphia prisons and organizations composed of such persons. The complaint requested a declaratory judgment that Aytch had infringed upon the First and Fourteenth Amendment rights of the inmates. Preliminary and permanent injunctions against Aytch's conduct relating to inmates meeting with representatives of the media were also sought.

The Philadelphia prison system consists of three institutions which house approximately 2400 prisoners. About 85% of the inmates are pretrial detainees charged with a wide variety of offenses. The remaining 15% of the prison's population are sentenced offenders serving terms of less than two years.[3]

In October, 1972, Inmates Action Council, one of the plaintiff associations, requested from Aytch permission to hold a press conference. The group wished to express to the public their concern that prisoners within the system were not receiving notice of continuance dates when trials or hearings were postponed. Aytch denied the request for a press conference after learning that the Philadelphia Voluntary Defenders Association, which represented many of the prisoners in their criminal cases and apparently was responsible for notifying prisoners of continuance dates, refused to have a representative attend the conference. The district court, sitting without a jury, found that Aytch was motivated in part by a concern that the inmates might prejudice their pending criminal cases, but also by a desire to avoid a possible clash between his office and the Defenders Association resulting from public criticism of the latter office by the inmates.

The plaintiff organizations attempted to schedule a second press conference in March, 1973. This meeting was intended to provide the news media with information regarding alleged improprieties in probation procedures. Representatives of the prisoner groups discussed the proposed news conference with Aytch on March 2nd. A second meeting was held on March 16th. In addition to Aytch, the supervisor of the Philadelphia probation office and the state's regional di-

---

1. Throughout this opinion "interview" will refer to face-to-face communication between an individual prisoner and a member of the press.

2. "Press conference" is used in this opinion, as it was by the district court, to advert to a meeting involving a group of prisoners and one or more reporters.

3. Holmesburg Prison has 1000 male residents who are either convicted offenders or pretrial detainees subject to bail in excess of $4,000; the Detention Center houses 750 adult males awaiting trial; the House of Correction has a population including both pretrial and sentenced adult males, juveniles held for trial, and female prisoners.

rector for parole supervision were present. At this second meeting, Aytch, according to the trial judge, informed the inmates that he had authority to permit such a conference but that he would refuse to do so unless the probation office concurred in his decision. The probation office apparently withheld its approval, and Aytch denied permission for the conference.

In spite of Aytch's decision, several inmates and their legal counsel scheduled a press conference on April 4, 1973. Aytch did not permit the conference to take place, explaining to the reporters that he had not sanctioned the news conference. He did, however, attempt to arrange some interviews between reporters and individual prisoners. These efforts notwithstanding, at least one newsman was refused permission to meet with an inmate whom he had specifically requested to see.

All personal contacts between the prisoners and the press, the district court found, must be approved in advance by Aytch. Although he possesses the authority to grant any such request, there is, according to the trial judge, a tacit understanding with the board of trustees of the prison system, the commissioner of public welfare and the city solicitor that Aytch will consult with them before taking any "major" action of that sort. If a request for an interview or press conference is denied by Aytch, there is no procedure for administrative review of that decision.

Notwithstanding Aytch's denial of permission to hold the two press conferences described above, the district court found that he had authorized other large gatherings of inmates and outsiders. More particularly, Aytch had permitted other group press conferences. One such instance was a briefing in May, 1973 sponsored by a prisoner group named "Gangs Relate with Society."

The district court found that the Philadelphia prison system has no written regulations and no standard policy with respect to personal contacts between inmates and reporters. In processing any such request Aytch, in the words of the trial judge, "attempts to gauge both the 'climate' or tension level of the institution and the purpose or subject matter of the interview. If the tension level in the prison is high, or the subject matter of the interview touches on a sensitive issue, the superintendent might decide that there is a 'security risk' in allowing the interview."

For instance, Aytch stated at trial that he might postpone or refuse an interview at which an inmate intended to air charges that white guards had beaten a black inmate. According to the trial judge, Aytch also declared that he might censor interviews dealing with "racial or religious" issues on the ground that such discussions would be "explosive." The superintendent is concerned, the trial court said, not only that "the inherently volatile nature of prison existence" presents a threat to the safety of the reporters visiting the institution, but also that inmates' statements regarding "sensitive issues" might be communicated back into the prison and result in disturbances.

The Supreme Court decisions in *Pell v. Procunier*[4] and *Saxbe v. Washington Post*[5] were announced while this case was under consideration by the district court.

In granting judgment for Aytch[6] the trial judge interpreted *Pell* and *Saxbe* to mean that regulations barring convicted prisoners from being interviewed by the press are constitutionally valid "so long as (a) there is no differentiation based upon the contents of the communication, and (b) the prisoners are not denied reasonable access to the press by alternative means. . . ." He declared that the

---

4. 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

5. 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974).

6. By stipulation a consolidated hearing was held with respect to both a preliminary and a permanent injunction. At the hearing the court granted plaintiff's motion for declaration of a class action.

rationale of *Pell* and *Saxbe* indicated that the plaintiffs have no First Amendment right to convene group press conferences in spite of the fact that the preponderance of the inmates are being held only pending a trial, rather than after a conviction.

The Supreme Court in *Pell* cited four governmental interests as justification for the restrictions on the First Amendment rights of convicted prisoners: deterrence of crime, rehabilitation of offenders, quarantining of criminals and the internal security of the prison system. Although the district court stated that the first three of these interests were largely inapplicable to the majority of the city's inmates, he decided that the legitimate governmental concern for prison security as well as the public interest in assuring that the inmates appear for trial, would be a sufficient basis for banning press conferences. The district court noted that these prisoners have alternative means of communicating with the press through the mail or individual interviews, and that Aytch "rarely" prohibits such interviews.

Although the trial judge recognized that the evidence indicated that Aytch had censored press conferences on the basis of their expected content, he denied injunctive or declaratory relief on the ground that he believed such censorship was unlikely to recur. The district court did not address the question whether written standards for the licensing of press conferences were necessary.[7]

The inmates and their organizations appealed. We vacate the judgment of the district court and remand the case for further consideration.

## II.

The plaintiff inmates and prisoner groups contend that Aytch has violated their First Amendment rights by permitting or prohibiting contacts between prisoners and the press on the basis of the expected substance of those discussions.

The prisoners also argue that the record provides no basis for believing that Aytch will discontinue such censorship voluntarily. In addition, the inmates assert that the absence of fixed, written standards governing Aytch's decision whether or not to allow specific meetings between themselves and reporters deprives them of due process. Further, in permitting some inmates contact with the press while denying such contact to others, the superintendent, according to the inmates, exercised unfettered discretion in a manner that deprived them of equal protection, since there is no reasonable basis for discriminating between the conferences permitted and those denied. Finally, the prisoners allege that *Pell* is inapplicable in the context of pretrial detention and that therefore they have a constitutional right to hold press conferences.

Aytch, on the other hand, responds that the reasoning of *Pell* and *Saxbe* clearly demonstrates that the plaintiff inmates have no constitutional right to hold group press conferences since reasonable alternative means of access to the press are available. The superintendent further contends that the limitations he has placed on the convening of such conferences are reasonable, and therefore constitutionally permissible regulations on the time, place and manner in which inmates may avail themselves of one of many possible forms of communication with the press.

## III.

■ Because of the complex and intractable nature of the task confronting prison officials and because of the character of the relationship between the states and the federal government, the federal courts should be reluctant to interfere in matters regarding the internal administration of the states' pretrial detention systems. Such a position would be consonant with the courts' traditional reticence about interfering in the operation of facilities for post-conviction in-

---

7. Neither party has contended before this Court, however, that the issue of written standards was not tendered to the trial court.

carceration.[8] Furthermore, though there may be differences in the rights enjoyed by pretrial as contrasted with sentenced prisoners, lawful imprisonment by its nature requires a dilution of the rights and privileges normally enjoyed by the general public outside the prison walls.[9]

■ Inmates, however, even those who have been convicted, are not totally destitute of constitutional rights to freedom of speech[10] and due process of law.[11] In *Pell* the Supreme Court declared that

A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.[12]

Since prisoners retain at least some constitutional rights, where those guarantees are infringed, the federal courts have a substantial interest in protecting them. As the Supreme Court has stated,

A policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or a state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.[13]

In the present case, regardless of the location of the frontiers of inmates' rights to freedom of speech, the administrators of the Philadelphia prisons have not deemed it necessary to prohibit all interviews and press conferences by those detained within the system. Nor does the record contain any indication that the administrators will do so in the future. It is, therefore, not necessary in this adjudication for us to decide whether accused individuals incarcerated prior to trial must, under the First Amendment, be given an opportunity for group meetings with representatives of the news media. For purposes of this case, therefore, we may assume arguendo that, as Aytch asserts, pretrial detainees have no constitutional right to such press conferences, or to direct interviews between themselves and reporters, because other reasonable means of access to the press are available and restrictions on media contacts serve some legitimate governmental interests, such as the security of the public, the prisoners, or the staff of the institution.[14]

■ Even if the prisoners held pending trial have no constitutional right to meet with reporters, the First Amendment precludes Aytch from regulating, through the grant or denial of permission for prisoners to talk with reporters,

8. See *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Gray v. Creamer,* 465 F.2d 179, 183 (3d Cir. 1972); *Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir. 1970).

9. See *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197, 1201 (3d Cir. 1973); *Gray v. Creamer,* 465 F.2d 179, 183 (3d Cir. 1972); *Collins v. Schoonfield,* 344 F.Supp. 257 (D.Md.1972); *Cf. Gittlemacker v. Prasse,* 428 F.2d 1, 3–4 (3d Cir. 1970).

10. *Owens v. Brierly,* 452 F.2d 640, 642 (3d Cir. 1971); *Nolan v. Fitzpatrick,* 451 F.2d 545 (1st Cir. 1971); *Fortune Society v. McGinnis,* 319 F.Supp. 901, 905 (S.D.N.Y.1970).

11. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Gray v. Creamer,* 465 F.2d 179 (3d Cir. 1972).

12. 417 U.S. at 822, 94 S.Ct. at 2802.

13. *Procunier v. Martinez,* 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). See *Gray v. Creamer,* 465 F.2d 179, 184 (3d Cir. 1972).

14. Compare *Pell,* 417 U.S. at 822–23, 94 S.Ct. 2800.

The security problem present in facilities primarily for pretrial detention should not be underestimated. As the trial judge noted in his opinion, between January 1, 1973 and September 1, 1973, there occurred within the Philadelphia prison system the following disturbances: "(1) 113 cases of assault, near riots, and other incidents requiring police intervention; (2) a homicide of a Holmesburg Prison resident . . . ; (3) the murder of the warden and the deputy warden of Holmesburg Prison . . . ; and (4) approximately 40 extraordinary occurrences including suicides, murders, escapes, etc."

the content of speech which reaches the news media, unless the restriction bears a substantial relationship to a significant governmental interest. While upholding a state prison's ban on all interviews between reporters and inmates specifically designated by the reporters, the Supreme Court in *Pell* emphasized that the prison policy there was applied uniformly and nondiscriminatorily.[15] The Court's approbation of the plan was conditioned as follows:

> So long as this restriction operates in a neutral fashion, without regard to the content of the expression, it falls within the "appropriate rules and regulations" to which "prisoners necessarily are subject, . . . " and does not abridge any first amendment freedoms retained by prison inmates.[16]

■ A fundamental purpose of the First Amendment is to foreclose governmental control or manipulation of the sentiments uttered to the public.[17] With only carefully calibrated exceptions,[18] "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[19] Therefore, when the government makes an avenue of communication available to the proponents of some views, the same opportunity must, absent exceptional circumstances, be afforded to others who wish to express their ideas in that manner, whether or not the governmental officials endorse or sanction the thoughts to be expressed.

[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say.[20]

■ In particular, state or local as well as federal officials, including prison administrators, may not prevent persons from publicizing their views in order to prevent criticism of other government agencies. The Supreme Court in *Martinez* struck down California regulations censoring communications mailed by inmates to persons outside the institution. Control of the mail had been utilized by prison officials to prohibit letters " 'criticizing policy, rules or officials' " and to prevent communications " 'belittling staff or our traditional system or anything connected with Department of Corrections.' " Under the First Amendment, the Court stated, "prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements."[21] Rather, the Court declared, the Constitution requires that any limitation or infringement on the expression of ideas must bear a substantial relationship to a significant government interest unrelated to the suppression of expression.[22]

■ The district court here found that Aytch denied requests by inmates to hold news conferences so as to avert public criticism of two other public agencies—the defenders association and the

---

**15.** 417 U.S. at 819, 826, 828, 94 S.Ct. 2800.

**16.** *Id.* at 828, 94 S.Ct. at 2807 (emphasis added).

**17.** *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

**18.** *See, i. e., Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

**19.** *Mosley,* 408 U.S. at 95, 92 S.Ct. at 2290.

**20.** *Id.* at 96, 92 S.Ct. at 2290. Cf. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

**21.** 416 U.S. at 415, 413, 94 S.Ct. at 1812, 1811.

**22.** *Martinez,* 416 U.S. at 412, 94 S.Ct. 1800. Cf. *Mosley,* 408 U.S. at 99, 101, 92 S.Ct. 2286; *Tinker v. Des Moines School District,* 393 U.S. 503, 509, 511, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Herndon v. Lowry,* 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937).

probation office. The district judge did not find that the requested meetings presented a security problem which made them impracticable. Instead, according to the district court, Aytch was willing to approve the conference requests if the organizations to be criticized acquiesced. When those agencies withheld their consent, Aytch refused to allow the conferences to take place. Aytch did, however, permit other inmates to hold press conferences on topics which he did not disapprove.[23]

Aytch's conduct, as found by the district court, constitutes invalid censorship of the thoughts and opinions sought to be expressed to the news media by the inmates of the Philadelphia prison system. Here, unlike in *Pell*, the ban on media contacts has not been applied "in a neutral fashion without regard to the content of the expression."[24]

 Notwithstanding what he called a "suggestion of censorship" in the evidence, the trial judge denied the prisoners the requested injunctive and declaratory relief. The decision whether to award equitable relief under the circumstances of a given case is largely within the discretion of the district court.[25] In the present case, the trial judge based the denial of an injunction against censorship upon the rationale that individual

interviews appeared to be generally available and that, since the opinions in *Pell* and *Saxbe* made clear that such censorship is constitutionally intolerable, it was reasonable to assume that Aytch would discontinue the custom. Under the circumstances here, we cannot say that the trial court abused its discretion.

## IV.

The inmates also allege that Aytch has infringed upon their right to due process by failing to promulgate written standards governing the withholding of permission to conduct interviews or press conferences within the institution.

 Prior restraints constricting freedom of expression, such as a selective ban on press contacts, because of the anticipated content of the speech are heavily disfavored under our legal system.[26] A public official may not constitutionally possess unrestricted power to license or to prohibit the exercise of First Amendment rights according to the official's own conception of what may be the socially beneficial course.[27] The Supreme Court has recently reiterated this principle:

Invariably, the Court has felt obliged to condemn systems in which the exercise of [an official's power to prevent speech in advance of actual expression]

**23.** The district court found that Aytch refused to allow press interviews with individual inmates "in rare instances." It is unclear from the decision of the district court on what basis Aytch rejected these requests. Censorship of interviews, however, would be subject to the same constitutional infirmities as censorship of press conferences.

**24.** The inmates also argue that Aytch's disparate treatment of news conference requests on the basis of his endorsement of the proposed subject matter denies the prisoners equal protection. The equal protection clause might well be a basis for finding Aytch's conduct unconstitutional. *See Mosley,* 408 U.S. at 95, 97, 92 S.Ct. 2286; *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951). However, the thrust of the two objections set forth by the inmates would appear to be substantially the same—although there is no all-inclusive ban on press conferences, the denial of plaintiffs' applications serves no legitimate governmental interest.

**25.** *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *United States v. W. T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

**26.** In *N. Y. Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the Supreme Court stated: " 'Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' " *Alderman v. Philadelphia Housing Authority,* 496 F.2d 164, 168–70 (3d Cir. 1974), *cert. denied* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974). *Cf. Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

**27.** *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

was not bounded by precise and clear standards. The reasoning has been, simply, that the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion [to bar an individual from utilizing a public forum].[28]

In *Shuttlesworth v. Birmingham*,[29] a city ordinance prohibited any parades or public demonstrations in the absence of a permit from the city commission. The commissioners were authorized to refuse a permit any time they believed that the "public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that it be refused."[30] "There can be no doubt," said the Supreme Court,

> that the Birmingham ordinance, as it was written, conferred upon the City Commission virtually unbridled and absolute power to prohibit any "parade," "procession" or "demonstration" [and] therefore, fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.[31]

Here, there are no statutes, ordinances or regulations which confine the scope of Aytch's discretion in granting or denying permission for face-to-face press contacts by the inmates. In the absence of controlling legislation or administrative direction, the superintendent remains free in exercising such power to apply his personal opinions, and even prejudices, unrelated though they may be to any

legitimate governmental interest. Lodging in an administrative official such unbounded latitude regarding what sentiments may be expressed constitutes a violation of the constitutional rights of those, like the plaintiff-inmates, who are denied permission to speak.[32]

 The trial court found that Aytch inhibits inmates from conducting press conferences on subjects he considers "explosive" or "sensitive." By the use of these descriptive terms the superintendent precluded discussions by the inmates that dealt with, among other things, race or religion. Even if embodied in regulations constituting prison policy with respect to permits for press conferences, a test predicated upon whether a proposed topic of an interview or conference is considered an "explosive" or "sensitive" issue is not sufficiently precise to survive constitutional challenge. Similarly, the "climate of the institution" is too nebulous a concept to furnish the necessary benchmark for determining whether speech should be restrained.

These criteria, applied by Aytch in determining whether to permit a news conference, provide too much occasion for subjective evaluation, thus enabling the licensing official to act as a censor.

In *Martinez*[33] the prison regulations authorized prison functionaries to halt all mail in which prisoners "unduly complain" or "magnify grievances," as well as all correspondence "expressing inflammatory political, racial, religious or other views or beliefs." "[L]ewd, obscene or defamatory" letters could also be censored. The Supreme Court held such provisions excessively vague. "These regulations", said the Court, "fairly invited prison officials and employees to

---

28. *Southeastern Promotions,* 420 U.S. at 553, 95 S.Ct. at 1244.

29. 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

30. *Id.* at 150, 89 S.Ct. at 938.

31. *Id.* at 150–51, 89 S.Ct. at 938.

32. *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Battle v. Anderson,* 376 F.Supp. 402, 425 (E.D.Okl.1974).

33. 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

apply their own personal prejudices and opinions as standards for prisoner mail censorship." [34]

The standards described by Aytch similarly lack the constitutionally indispensable "narrowly drawn limitations" [35] on administrative discretion.

■■■■ Accordingly, the district court should, on remand, direct that if Aytch intends to continue to grant some but not all prisoner requests for interviews and press conferences he should develop proposed regulations governing the issuance of permission for inmates to participate in news interviews or press conferences. Such regulations should limit the discretion exercised by prison personnel in approving or disapproving requests for media contacts. They should delineate precise and objective tests, necessary to protect one or more legitimate governmental interests, [36] on the basis of which such permission may be denied.

### V.

The inmates here also assert that, even if there were specific written standards governing the convening of press conferences and interviews, they would still be denied due process by the absence of procedures by which a prisoner frustrated in his efforts to meet with reporters may obtain administrative review of the denial in order to assure the implementation of the standards.

In *Martinez* the Supreme Court, noting that the mandated procedures were not unduly burdensome to the prison administrators, specifically approved that portion of the district court's order which required that an inmate be notified of the prison's objection to a letter written by or addressed to him, and that the author of the offending letter have a reasonable opportunity to protest the censorship decision to an official other than the one who had originally objected to the letter. [37]

■■■■ Although the scope of a prisoner's First Amendment rights is not unaffected by the fact of his incarceration, an inmate's interest in communicating with the press through face-to-face encounters is, like his interest in sending and receiving mail, "grounded . . . in the First Amendment" and therefore is encompassed within the interests in "liberty" protected by the Fourteenth Amendment. [38] The nature of the procedures sufficient to satisfy due process depends upon a balancing of the individual rights and the governmental interests affected. [39]

On remand, therefore, the district court should implement a review proce-

---

**34.** *Id.* at 415, 94 S.Ct. at 1812. *See also Shuttlesworth v. Alabama,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

**35.** *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951).

**36.** It is not necessary, however, that Aytch or his subordinates reject applications for a meeting between prisoners and the press *only* when the officials can establish indisputably that the meeting would defeat a significant governmental interest. In *Procunier,* 416 U.S. at 413–14, 94 S.Ct. at 1811, the Court declared that a restriction on inmate correspondence that furthers an important governmental interest will nevertheless be invalid if its sweep is unnecessarily broad:

This does not mean, of course, [The Court explained] that prison administrators may be required to show *with certainty* that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. (emphasis added)

**37.** *Id.* at 417–19, 94 S.Ct. 1800.

**38.** Compare *Id.* at 418, 94 S.Ct. 1800. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**39.** *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *In-Cho Chung v. Park,* 514 F.2d 382 (3d Cir. 1975).

dure which, without unduly impairing the efficiency of the Philadelphia prisons, would assure a fair and rational determination of the facts upon which prison administrators propose to foreclose an inmate from freely expressing his thoughts to the news media.[40]

## VI.

The judgment of the district court will be vacated, and the case remanded for proceedings consistent with this opinion.

40. *See Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okl.1974).