No. 55,464

JOE ARNEY and FERRINE, INC., *Appellees,* v. DIRECTOR, KANSAS
STATE PENITENTIARY, *Appellant.*

(671 P.2d 559)

Opinion filed
October 21, 1983.

*Daniel L. Doyle*, special assistant attorney general, argued the cause, and

*Charles E. Simmons,* chief legal counsel, Department of Corrections, was with him on the brief for appellant.

*Thomas M. Dawson,* of Leavenworth, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by the defendant, the Director of the state penitentiary at Lansing, from an order of mandamus issued by the district court. Appellee-plaintiff, Joe Arney, is an inmate of the penitentiary and appellee-plaintiff, Ferrine, Inc. (Ferrine), is a corporation whose business includes the production of television programs. The television show "Lie Detector" was one of its productions. Appellees sought an order in mandamus directing the defendant to allow Ferrine to administer a polygraph examination to Arney and have the examination videotaped for presentation on the program. The district court granted the order and the Director has appealed. We reverse.

Ferrine was the producer of "Lie Detector," a national television show hosted by a well-known attorney who first presents the background of guests who claim their reputation, credibility, or responsibility for an event has been wrongfully adjudged by others. These guests are then administered a polygraph examination by an expert technician for the purpose of validating the guests' stories, with both the test and the results being shown on television. The results may or may not be favorable to the guest. Plaintiff Arney, who has consistently maintained his innocence for the murder and other crimes of which he was convicted and imprisoned almost ten years ago (*State v. Arney,* 218 Kan. 369, 544 P.2d 334 [1975]), saw in this show an opportunity to get a free polygraph examination and to get his story before the public. He contacted the producers about an appearance. Ferrine was interested in his story.

On February 21, 1983, a representative of Ferrine contacted Mr. Troy Baker, administrative assistant to the Director of the penitentiary, about the possibility of videotaping the examination of inmate Arney. Mr. Baker indicated that he personally saw no problem with the visit as proposed, but that final approval could only be obtained from the Director, who was out of town at the time. Ferrine decided to go ahead with the story. The next day Mr. Baker contacted Ferrine representatives suggesting they send a letter of format and request to enter the penitentiary. The letter was sent the same day. Six days later, on February 28,

1983, a Ferrine representative again called Mr. Baker, who informed him that a Department of Corrections meeting was scheduled for March 1, at which Ferrine's request would be considered. On March 2nd the Director told Ferrine he had forwarded the request to the Secretary of Corrections, and he expected a decision the next day. On March 4, 1983, the Director denied permission for Ferrine to enter the prison. By this time, in reliance on the earlier favorable representations, the show's producer had invested approximately $30,000 in preparation for the interview and filming.

Appellees filed a petition in the District Court of Leavenworth County on March 5th, seeking an order directing prison officials to allow the visit as planned. A hearing on the petition was set for Monday, March 7th. At the outset of the hearing on March 7th, the Director argued that the nature of the petition was a motion for habeas corpus dealing with the conditions of Arney's confinement as an inmate. On this ground the Director moved to dismiss the case for plaintiff's failure to exhaust administrative remedies. Plaintiffs' counsel responded that the petition was strictly in the form of mandamus and the court took the motion for dismissal under advisement and proceeded with the hearing. At the conclusion of the testimony the court denied the defendant's motion, agreeing that the nature of the petition was mandamus. We agree with that determination of the trial court.

The court, in its decision granting mandamus, identified a number of competing interests at stake in the case, primarily the inmate's First Amendment rights of speech and expression and his right to counsel and assistance in pursuing post-conviction remedies as opposed to the State's interest in the unhampered ability to run its prisons and maintain security. The court also gave consideration to the fact that Ferrine had already expended $30,000. The court found the critical element to be the absence of a written policy by the prison authorities regarding access between inmates and the news media, as a result of which decisions could only be made on a case-by-case basis by the director. The court perceived these decisions as unavoidably arbitrary due to the lack of a written policy, and thus subject to review by the court. In its ensuing review, the court employed a balancing test, weighing the harm to the State if the order were to issue against the harm to inmate Arney's rights if relief were to

be denied. On balance the court judged the inmate's interests to outweigh those of the prison administration. The court granted appellees' request, ordering the Director to permit Ferrine access to the prison by 3:30 p.m. that day. The district court denied appellant's motion to stay the proceedings pending appeal. Defendant immediately filed a notice of appeal and a motion to stay the judgment of the district court with the Kansas Court of Appeals. The stay was granted prior to the 3:30 p.m. deadline. The appeal has been transferred to this court pursuant to K.S.A. 20-3018(c).

At the outset appellees contend that the application of the remedy of mandamus is not subject to attack asserting that the Director failed to object at the trial level. The contention lacks merit. The petition of the plaintiffs did not specifically designate their legal theory and the Director attempted to secure a dismissal on the grounds the petition was in the nature of habeas corpus and Arney had not exhausted his administrative remedies. The court held, and we agree, that the petition asserted a cause of action in mandamus and granted the order of mandamus. The issue of whether that order was correct is properly before this court on appeal.

Before turning to the merits of the appeal, certain basic principles of the use of mandamus will be reviewed. K.S.A. 60-801 defines mandamus as

"a proceeding to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law."

It is well established that mandamus will not lie for the performance of an act involving discretion on the part of a public official. *Topeka Bldg. & Construction Trades Council v. Leahy,* 187 Kan. 112, 353 P.2d 641 (1960). In *Lauber v. Firemen's Relief Assn. of Salina,* 195 Kan. 126, 128-29, 402 P.2d 817 (1965), we said:

"It has uniformly been held that the remedy of mandamus is available only for the purpose of compelling the performance of a clearly defined duty; that its purpose is to require one to whom the writ or order is issued to perform some act which the law specifically enjoins as a duty resulting from an office, trust, or station, that mandamus may not be invoked to control discretion and neither does it lie to enforce a right which is in substantial dispute, and further, that resort to

the remedy may be had only when the party invoking it is clearly entitled to the order which he seeks."

As early as 1888, Justice Valentine in *Martin, Governor v. Ingham*, 38 Kan. 641, 651, 17 Pac. 162, stated:

"The only acts of public functionaries which the courts ever attempt to control by either injunction or *mandamus*, are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed."

Under K.S.A. 60-801 a duty which may be enforced by mandamus can arise either from the office of the Director or by operation of law. Was the Director under a duty to permit visitation between Arney and representatives of Ferrine for the purpose of administering a polygraph test and to videotape the procedures for use on the television program? We think not.

The statutory duties of a director of a Kansas correctional institution are set forth in K.S.A. 1982 Supp. 75-5252, which provides:

"Subject to the general supervision of the secretary of corrections and applicable rules and regulations adopted by the secretary, it shall be the duty of the director of each correctional institution:

(*a*) To oversee the government and discipline of the correctional institution, and to superintend all business concerns thereof.

(*b*) To give necessary directions to the officers and employees and to examine whether they have been careful and vigilant in their respective duties.

(*c*) To examine into the state of the correctional institution and for the health, conduct and safekeeping of the inmates.

(*d*) To use every proper means to furnish employment to the inmates most beneficial to the public and best suited to their several capacities under the direction of the secretary.

(*e*) To take charge of all real and personal property belonging to the state in and about the correctional institution or appurtenant thereto."

The statute also makes a director's duties subject to the rules and regulations adopted by the secretary of the department of corrections. In the rules and regulations, inmate visitation is governed by K.A.R. 1982 Supp. 44-7-104. Under K.A.R. 1982 Supp. 44-7-104(a)(3), unrestricted visitation is permitted by certain state officials, the inmate's attorney, and members of the clergy. Other than these people, an inmate is entitled to submit a list of ten friends or relatives whom he or she desires to have visit in the institution and this list is then processed by the administration, which determines whether permission for visitation will be

granted. K.A.R. 1982 Supp. 44-7-104(a)(2). It does not appear in the record that Ferrine, Inc. was listed by Arney as a "friend" for the purposes of visitation. Outside of these two groups of people, a director's responsibilities concerning requested visits are as follows:

"Those individuals requesting visits with an inmate, who are not designated on the list [submitted by the inmate], shall be interviewed and identified by authorized personnel. If the requested visits conform to institutional, facility and departmental requirements, one (1) visit *may* be approved pending further investigation and approval of subsequent visits." K.A.R. 1982 Supp. 44-7-104(a)(3). (Emphasis added.)

Thus it appears clear that there is no absolute duty which devolves upon the Director by statute, regulation or by the office itself which would require the Director in this case to grant the requested interview. There was no duty to allow access to Ferrine, and Arney did not follow the proper procedures to seek permission for the interview. Assuming that the "Lie Detector" program could be considered as being news media, which is by no means established, our conclusion that the Director was under no affirmative duty to permit the visit by virtue of statute or departmental regulation is supported by the following statement appearing in the department's internal management guidelines: "All decisions concerning media access to correctional facilities shall be made by the principal administrator [institutional director]." Kan. Dep't. Corr., Internal Mngmt. Pol. and Proc., Sec. No. 08-104, p. 1 (1982). Sec. No. 08-104, approved by the Secretary of Corrections August 15, 1982, sets forth the policy and procedure for media access to correctional institutions.

Any duty, the performance of which can be compelled by mandamus, must therefore arise solely by operation of law. Do the nature and degree of the plaintiffs' legal rights under the Constitution create a duty on the part of the Director, as a state official, to permit visitation between the media and a specifically designated inmate? The answer is no. Plaintiffs' rights under established constitutional law do not rise to the level creating any duty which may be enforced against the appellant. For the purpose of further discussion we will assume that the program "Lie Detector" is a part of the news media, although such an assumption is not borne out by the record. To the contrary, the trial judge refused to make any such specific determination

when he stated in his decision: "I don't know whether they [Ferrine, Inc. and the program "Lie Detector"] truly would qualify as news media." However, the case was decided at the trial level and has been presented on appeal as being a First Amendment question involving news media and we will consider it in the same fashion.

Both the appellees and the trial court relied on *Main Road v. Aytch,* 522 F.2d 1080 (3d Cir. 1975). That case held unconstitutional a prison superintendent's denial of inmate requests to hold news conferences where permission was withheld in order to avoid public criticism by the inmates of two state agencies. Guided by the constitutional principle that "any limitation or infringement on the expression of ideas must bear a substantial relationship to a significant government interest unrelated to the suppression of expression," (*Main Road* at 1087), the defect found by the Third Circuit Court of Appeals was that the superintendent's ban on media contacts had not been applied in a neutral fashion with regard to the content of the expression. Superintendent Aytch refused to permit inmate press conferences concerning the services of two public agencies, press conferences which he believed might entail public criticism of those agencies, yet he allowed other inmate press conferences on topics which he did not disapprove. We find the facts of that case distinguishable from those present here, and of little support for any duty on the part of the State to permit the mutual access and visitation sought by plaintiffs.

The district court judge in this case interpreted *Main Road* as supporting an inmate's right of some access to the media. However, in *Main Road,* the Third Circuit recognized that inmates retain only *limited* First Amendment rights after incarceration, and that even a sweeping ban on interviews between reporters and inmates specifically designated by those reporters, is constitutionally proper as long as the policy is applied uniformly and without discrimination:

"*So long as this restriction operates in a neutral fashion, without regard to the content of the expression,* it falls within the 'appropriate rules and regulations' to which 'prisoners necessarily are subject, . . .' and does not abridge any first amendment freedoms retained by prison inmates." 522 F.2d at 1087. (Emphasis in original.)

An inmate's right of access to the news media is only a qualified

right, and gives rise to no affirmative duty on the part of prison officials other than to regulate that right uniformly, consistent with other governmental interests relating to prison administration including prisoner's rights.

Appellees' reliance on *Main Road v. Aytch* is based on the assertion that the Director's decision in this case was arbitrary, and thus reviewable, because it violates due process requirements that any denial must be based on written policy when it deals with a constitutional right. It is correct the decision in *Main Road* was based partially on the absence of any statutes, ordinances, or regulations defining the scope of the superintendent's discretion. The court stated:

"A public official may not constitutionally possess unrestricted power to license or to prohibit the exercise of First Amendment rights according to the official's own conception of what may be the socially beneficial course." 522 F.2d at 1088.

However, combined with the lack of written standards in that case was overwhelming evidence that the superintendent there exercised his discretion based largely on the anticipated content of the speech.

In the present case much is made of the lack of a written policy by the Director governing visits of the type proposed by plaintiffs. The allegations that no written policy exists are not completely accurate. As previously indicated the Secretary of Corrections on August 15, 1982, issued a written policy and procedure covering news media access to the correctional facilities. (Kansas Department of Corrections, Internal Management Policies and Procedures § 08-104.) The procedure, while not comprehensive, does provide written guidelines for news media access. In addition, this was a unique request and the first occasion that the Director had been faced with a determination of whether the filming of a commercial television entertainment program would meet the guidelines established by the Secretary of Corrections and whether such an intrusion would be in the best interests of all parties. The presence of written departmental criteria and the absence of any content-based discrimination on the part of the Director are sufficient to overcome the lack of a more detailed express written policy on the subject, and serve to distinguish the present case from *Main Road v. Aytch*.

No affirmative duty to permit this visit is imposed on the Director by virtue of any rights residing in appellee Ferrine,

Inc., the film company. The trial court rejected out-of-hand its claim of a "right to visitation." Even under our assumption that the program qualifies as "news media" under constitutional analysis, something which is by no means certain, we would agree with the district court's decision in this regard. See *Houchins v. KQED, Inc.*, 438 U.S. 1, 57 L.Ed.2d 553, 98 S.Ct. 2588 (1978); *Pell v. Procunier*, 417 U.S. 817, 41 L.Ed.2d 495, 94 S.Ct. 2800 (1974); and *Saxbe v. Washington Post Co.*, 417 U.S. 843, 41 L.Ed.2d 514, 94 S.Ct. 2811 (1974). As stated by Chief Justice Berger in *Houchins*, "[T]he media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally." 438 U.S. at 16.

In addition to the argument that there was no written policy, Arney claims an absolute right of access to the media under the First Amendment. This claim is governed by the federal Supreme Court's decision in *Pell v. Procunier*, 417 U.S. 817. In *Pell*, state prison inmates and journalists brought actions attacking the constitutionality of a state regulation prohibiting face-to-face interviews between news media representatives and individual inmates whom the representatives specifically named and requested to interview. In the consideration of face-to-face communications between inmates and the media, the Court stated:

"[I]t is obvious that institutional considerations, such as security and related administrative problems, as well as accepted and legitimate policy objectives of the correctional system itself, require that some limitation be placed on such visitations. So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, 'prison officials must be accorded latitude.'" 417 U.S. at 826.

Based primarily on the security considerations of prison administration the Court concluded that where there are alternative channels of communication open to prison inmates, a restriction on one manner of communication is constitutionally permissible under the First and Fourteenth Amendments as long as the restriction operates in neutral fashion without regard to the content of the expression. *Pell*, 417 U.S. at 828. The available alternative means of communication identified in *Pell* mirrors those existing for inmate Arney in the present case: communication by mail; visitation rights with family, clergy, attorneys, and friends of prior acquaintance; and the opportunity to communicate with the press or other members of the public through those persons permitted to visit him at the prison. Finally, the Court

addressed the role of the judiciary with regard to these decisions when made by prison administrators:

"Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. Courts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties. But when the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation." 417 U.S. at 827.

Arney's constitutional rights were not violated by the Director's decision to deny the interview between the plaintiffs.

Finally, Arney asserts that the Director's actions affected Arney's rights to counsel and pursuit of post-conviction remedies. Precisely how these rights are infringed by plaintiff's inability to take a polygraph examination on television is unclear, and we agree with the State that whatever the relationship, it is so tenuous as to be without merit. In Kansas, polygraph examinations are inadmissible in court except by stipulation of the parties, and any of the other proposed uses of the results by plaintiff in pursuit of his post-conviction remedies are pure speculation. Additionally, Arney has in no way been denied access to counsel, and his assertion that "counsel" and the show are somehow related is frivolous.

Returning to the basic elements of the proper use of mandamus, as set forth early in the opinion, the trial court saw a need to adopt a balancing test of the respective rights of the plaintiffs as opposed to the position of the Director to determine whether a duty existed. The trial court resolved its balancing test in favor of plaintiffs. However, the need to adopt a balancing test or the use of a balancing test is inimical to the right to mandamus. The process adopted by the trial court recognized there was no clear duty upon the Director and, absent illegal, arbitrary or unreasonable action, mandamus is not a proper remedy. We find no abuse of discretion in the Director's decision which would constitute an illegal, arbitrary or unreasonable act justifying the application of mandamus. See, *State ex rel., v. Unified School District*, 218 Kan. 47, 50, 542 P.2d 664 (1975).

K.A.R. 1982 Supp. 44-15-101 *et seq.* sets forth a comprehensive

grievance procedure by which inmates at state institutions are to proceed when they believe that they have not been properly treated or have been denied some right. The administrative remedies provided by the regulations should be exhausted before the court determines to adjudicate an alleged grievance.

The order of the district court is vacated and the case remanded with directions to dismiss this action.