No. 64,350

STATE OF KANSAS *ex rel.* ROBERT T. STEPHAN, Attorney General, *Petitioner,* v. THE KANSAS RACING COMMISSION; HARRY AN- THONY, KAY ARVIN, BERT CANTWELL, ALFRED SCHROEDER, AND H. PHILIP MARTIN, in their capacity as Commissioners of the Kansas Racing Commission; and JAMES R. COBLER, Director of Accounts and Reports, *Respondents.*

(792 P.2d 971)

Opinion filed May 25, 1990.

*Robert T. Stephan,* attorney general, argued the cause, and *John W. Campbell,* deputy attorney general, and *Daniel P. Kolditz,* assistant attorney general, were with him for petitioner.

*Robert E. Keeshan,* of Hamilton, Peterson, Tipton & Keeshan, of Topeka, argued the cause, and *Leon B. Graves,* of the same firm, was with him on the brief for respondents.

*R. Scott Beeler,* of Gage & Tucker, of Overland Park, argued the cause, and *J. Patrick Shepard,* of the same firm, was with him on the brief for intervenor Sunflower Racing, Inc.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an original action in mandamus brought by the attorney general against the Kansas Racing Commission (Commission), individual members of the Commission, and James R. Cobler, Director of Accounts and Reports. At issue is the $250,000 deposit paid by Sunflower Racing, Inc., (Sunflower) pursuant to K.S.A. 1989 Supp. 74-8815(d). The attorney general is asking this court to find that the statute mandates forfeiture of the deposit and requests an order compelling respondents to perform their duty pursuant to the statute by refraining from obtaining or delivering the $250,000 deposit to Sunflower.

The facts are not in dispute. On November 4, 1986, the Kansas Constitution was amended to permit horse and greyhound racing with a parimutuel system of wagering. Kan. Const. art. 15, § 3b. The Kansas Parimutuel Racing Act, K.S.A. 1989 Supp. 74-8801 et seq. was enacted on May 28, 1987. Members of the Commission, which conducted its first regular meeting in August 1987, included former Kansas Supreme Court Chief Justice Alfred Schroeder, former Wyandotte County Sheriff and Highway Patrol Superintendent Bert Cantwell, former Representative H. Philip Martin, former District Court Judge Kay Arvin, and former veterinarian and University of Kansas Professor Harry Anthony. All are respondents in this action.

On March 3, 1988, The Racing Association of Kansas-Southeast (TRAK) filed an application for an organization license to conduct greyhound races, and Sunflower Racing, Inc., (Sunflower) filed an application for facility owner and facility manager licenses to construct, own, operate, and manage a greyhound racing facility in Pittsburg, Crawford County, Kansas. TRAK contracted with Sunflower to conduct its races at Sunflower's track. Initially, R.D. Hubbard and Richard J. Boushka owned equal stock in Sunflower. Sunflower's owner and facility manager applications were accompanied by a nonrefundable application fee of $5,000 for each license for a total of $10,000. K.S.A. 1989 Supp. 74-8815(c). Sunflower also filed a deposit of $500,000, which was an appropriate amount for a racing schedule that would include more than 150 racing days in a year. K.S.A. 1989 Supp. 74-8815(d). When a conditional license was subsequently issued for less than 150 racing days during the calendar year, it was established that the

deposit need be only $250,000; the excess $250,000 was refunded to Sunflower, which the attorney general concedes was appropriate. The deposit at issue in this action is the remaining $250,000.

On March 7, 1988, two additional groups applied for licenses to construct and operate a greyhound racing facility in Crawford County, Kansas. The Little Balkans Foundation filed an application for an organization license, Camptown Racing, Inc., filed for a facility manager license, and Camptown Development Limited Partnership filed for a facility owner's license. This group will hereinafter be referred to as Camptown/Little Balkans. In addition, O.G.B. Charities, Inc., (OGB) applied for an organization and facility owner's license, and Crawford County Racing, Inc., for a facility manager license.

On September 16, 1988, the Commission conditionally granted the following three licenses: An organization license to TRAK pursuant to K.S.A. 1989 Supp. 74-8802(n) and K.S.A. 1989 Supp. 74-8813, and facility owner and facility manager licenses to Sunflower pursuant to K.S.A. 1989 Supp. 74-8802(f) and (g) and K.S.A. 1989 Supp. 74-8815. The TRAK organization license is not at issue in this action. Applications of the two competing groups, Camptown/Little Balkans and OGB, were denied.

The owner and manager licenses issued to Sunflower were expressly conditioned upon providing a financial commitment approved by the Commission as required by K.S.A. 1989 Supp. 74-8815(j). 'The order, which gave Sunflower 150 days from the date of licensing to submit a commitment for financing, stated:

"(a) Sunflower Racing, Inc., shall promptly enter final negotiations with its lender or lenders and shall file with the commission within 150 days following the date of this order final loan documents of all lenders participating in the loan commitment, security documents and all other evidence of indebtedness, guarantees or assurances necessary to obtain closing of the construction loan described in the verified application. The documents shall be substantially in the form described in the verified application. Closing of the loan shall be completed to the commission's satisfaction and approval within 150 days of this date, unless this order is extended.

. . . .

"(d) Sunflower Racing, Inc., shall adhere to the plans and specifications and the construction schedule set forth in the application except as approved by the commission after applicant files a revised schedule with the commission in the same format used for its application. Applicant shall diligently

pursue the planning, acquisition, construction and completion of each phase of the project on the date set forth in the schedule subject to strikes, accidents, acts of God, weather conditions, documented shortage of labor and materials, *litigation* or other actions and circumstances beyond the control of the two applicants." (Emphasis added.)

In the order, the Commission concluded that issuance of licenses to Sunflower for a greyhound racing facility in Pittsburg/ Crawford County would facilitate management development and minimize operating cost because Sunflower was similarly licensed in Kansas City, Kansas. Finally, the order provided that failure to abide by the terms of the license and the conditions set forth therein would be just cause for the Commission to pursue statutory remedies.

Kansas Racing Management, Inc., and Wyandotte County Economic Development, who were unsuccessful applicants for organization and facility owner licenses in the Kansas City, Kansas, area, appealed the Commission's denial of their applications (KRM appeal). The Commission and Sunflower were both respondents in that litigation. The KRM appeal, which was decided February 27, 1989, in *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 770 P.2d 423 (1989), decided many, but not all, issues that were presented in Camptown/Little Balkans litigation involving the Pittsburg/Crawford County racetrack.

Immediately after the Commission granted Sunflower a facility owner license, the Little Balkans Foundation petitioned this court for review of that decision, filing its petition on October 14, 1988. Camptown Racing, Inc., and Camptown Development Limited Partnership filed separate petitions for review with this court on October 17, 1988. These three cases were consolidated for briefing.

Meanwhile, on October 28, 1988, the Commission approved a change in stock ownership in Sunflower Racing, Inc., with R.D. Hubbard owning 60% and and Richard J. Boushka owning 40% of the stock but with the voting control remaining equally divided by proxy agreement. On January 27, 1989, Sunflower requested a minimum 60-day extension for presentation of financing documents for approval by the Commission. In light of the pending litigation regarding Sunflower and the Pittsburg/Crawford County facility, as well as other contingencies, on February 3, 1989, the

Commission agreed to extend the time for approving TRAK's financing documents until April 14, 1989, "with the understanding that the track would be built as scheduled, that the lender would be the same as the Kansas City facility and that the non-profit group was provided notice and was in agreement." Pursuant to K.S.A. 1989 Supp. 74-8815(j), the Commission can authorize additional time for a facility owner licensee to submit a commitment for financing. The statute does not prescribe a minimum nor a maximum period of time or limit the Commission to a single extension.

On March 11, 1989, Sunflower asked the Commission for an additional six months in which to file its loan documentation for the Pittsburg/Crawford County facility, pointing out that the pending appeals had caused potential lenders to refuse to finalize loans for the construction of the Pittsburg facility. The Commission took the request under advisement.

On April 21, 1989, Camptown/Little Balkans objected to any additional time for Sunflower's submission of a financial commitment, but the Commission tabled the request for one week. On April 28, 1989, the Commission granted Sunflower an extension of six months to file financing documents or by the 15th day after an opinion issued by this court in the Pittsburg area licensing appeal. Thereafter, on May 2, 1989, Camptown/Little Balkans voluntarily dismissed their Pittsburg area licensing appeal. By this time, Sunflower's original proposed lender, a Miami, Florida, bank, had withdrawn its financial support of the Pittsburg/Crawford County facility.

On May 12, 1989, the Commission granted Sunflower an extension until June 23, 1989, to seek alternative financing and to file financing documents. Documents were filed with the Commission on June 22, 1989, that included an assignment to a new partnership including a buyout of R.D. Hubbard's interest in the Kansas City track. A principal of one of the new partners was Paul W. Bryant, Jr., who would assume primary responsibility for financing the Pittsburg/Crawford County racetrack. Bryant presented a $12 million letter of commitment from First Alabama Bank. The Commission was asked to approve an agreement in which TRAK assumed a management agreement identical to its

previous one with Sunflower. The request included a complete audit of Sunflower.

Pursuant to K.S.A. 1989 Supp. 74-8815(e), the Commission must find at the time of licensure that the means and sources of financing the facility are "sufficient to convince the commission that such plans are feasible." On June 23, 1989, Sunflower requested modification of its license order for the Pittsburg/Crawford County racetrack because it was not possible to obtain financing due to the pending litigation. On June 30, 1989, the Commission granted conditional approval of the proposal to buy out R.D. Hubbard's interest in the Kansas City and Pittsburg/Crawford County tracks by the Greene Group, Inc., which was led by Bryant. The Commission gave the parties until August 1, 1989, to file finance and partnership documents. The approval, which was journalized in an order of July 14, 1989, was conditioned in part upon Bryant's decision of whether to complete the proposed acquisition, which decision would be made after an audit but before July 31, 1989.

In an order of July 14, 1989, the Commission approved assignment of the facility owner and the facility manager licenses of Sunflower Racing, Inc., to Sunflower Racing Partnership, a partnership to be formed by Sunflower Racing, Inc., and a subsidiary of the Greene Group, Inc.

Loan documents submitted by Sunflower contained a commitment for financing by First Alabama Bank that reflected a 90% ownership by Kansas Pari-Mutuel Management, Inc., a wholly-owned subsidiary of the Greene Group, Inc., and only 10% ownership by Sunflower Racing, Inc., a limited partner. The officers of the Kansas Pari-Mutuel Management, Inc., would be Bryant, Sam M. Phelps, and A. Wayne May. Sunflower's limited partnership gave the general partner the right to dismiss any and all managers from employment, to sell the assets of the partnership without the consent of the limited partner, and to keep the books and records of the partnership in Alabama.

On August 4, 1989, Bryant and Sam Phelps, of the Greene Group, and R.D. Hubbard, of Sunflower, addressed the Commission, answering questions about financing and construction of parimutuel greyhound racing tracks. The Commission tabled the decision to consider the status of the $500,000 deposit, the fi-

nancing documents, and the allegations of Camptown/Little Balkans. The Sunflower Racing Limited Partnership (Sunflower/ Bryant) proposal would have changed the seating, parking, and other aspects of the Pittsburg/Crawford County racing facility. On or about August 4, 1989, after Assistant Attorney General Janet Chubb advised the Commission that Sunflower had filed final loan documents, the Commission exercised its discretion and rejected the Sunflower/Bryant proposal.

On August 11, 1989, Sunflower distributed a letter asserting its desire to have the Commission approve its financing proposal, but offered to voluntarily return the conditional manager and owner licenses for Crawford County in exchange for the return of Sunflower's $500,000 application deposit. In the letter, Sunflower recognized that the $500,000 deposit was $250,000 more than was needed for a racing schedule that involved fewer than 150 days of racing in a calendar year but explained that it left the overdeposit of $250,000 in the account as a good faith gesture with the Commission on the chance that extensions of the racing season would be sought.

The Commission's statutorily assigned legal counsel from the attorney general's office then requested a formal attorney general's opinion regarding the following inquiries:

"(1) What is the status of the application deposit required by K.S.A. 1988 Supp. 74-8815(d) if the facility owner licensee voluntarily returns the conditional facility owner license to the commission? May the deposit be refunded, and if so, under what circumstances and statutory procedure[?]

"(2) What is the status of the organization licensee's license, K.S.A. 1988 Supp. 74-8813, when the facility owner licensee and facility manager licensee, contracted to construct and operate a racetrack, voluntarily return the conditional facility owner and conditional facility manager licenses to the commission[?]"

Potential competitors Crawford County Racing, Inc., OGB, and Camptown/Little Balkans favored refunding to Sunflower its entire deposit.

On August 25, 1989, the attorney general issued his opinion, No. 89-108, that the $250,000 application deposit required by K.S.A. 1989 Supp. 74-8815(d) is forfeited upon voluntary surrender of a facility owner's license. The opinion concluded that a deposit is not forfeited unless the licensee failed to complete the

racetrack facility in accordance with the terms of the license as provided by K.S.A. 1989 Supp. 74-8815(d). The opinion rejected the argument that no failure occurred by the facility owner licensee if the Commission requested a voluntary surrender of the license. Instead, the opinion stated: "[T]he commission generally should not be in a position of having to request surrender of a license if problems with the license do not exist." Att'y Gen. Op. No. 89-108. Thus, the opinion concluded that the application deposit required by K.S.A. 1989 Supp. 74-8815(d) "is forfeited if the facility owner licensee voluntarily surrenders the license to the commission." Att'y Gen. Op. No. 89-108. In response to this opinion, Sunflower's offer to surrender the license for a racing facility in Pittsburg, Kansas, was withdrawn. The Commission tabled the issue of modification of the Sunflower license for four weeks pending an update of information from the KBI on Bryant and the Greene Group.

On September 22, 1989, the Commission rejected the proposal of the Bryant group to restructure and refinance TRAK's facility owner and manager, which was to be done by the Greene Group and Sunflower. At that time, Sunflower had fully complied with the orders of the Commission to submit financing documents.

On October 13, 1989, the Commission determined that, if Sunflower's $250,000 deposit was forfeited, it would not be used to benefit the racing industry but, instead, would go to the state gaming revenue funds. The Commission voted to request return of the facility owner and facility manager licenses from Sunflower because Sunflower had acted in good faith, but litigation and the Commission's disapproval of the Bryant proposal prevented Sunflower's fulfillment of the conditions. The Commission voted unanimously to accept Sunflower's offer to return the licenses. When the attorney for Sunflower then asked for the remaining $250,000 application deposit, the Commission voted to return it because Sunflower complied with the Commission's request for the license. The Commission also gave TRAK 60 days to propose a new facility owner/facility manager for the Crawford County racetrack project.

Sunflower never began construction of the Pittsburg/Crawford County racetrack facility. At no time did the Commission find Sunflower's means and sources of financing were not feasible

under K.S.A. 1989 Supp. 74-8815(e), but instead exercised its discretion in rejecting the Sunflower/Bryant proposal.

The Commission's formal order disapproved assignment of the facility owner and facility manager licenses of Sunflower Racing, Inc., to Sunflower Racing Partnership, a partnership to be formed by Sunflower Racing, Inc., and a subsidiary of the Greene Group, Inc.

The petition for mandamus was filed on October 18, 1989. This court denied the attorney general's motion for a peremptory order but granted a temporary restraining order.

We must first determine if mandamus is an appropriate remedy. Mandamus is a proceeding "to compel some inferior court, tribunal, board, or some corporation or person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." K.S.A. 60-801. The Kansas Supreme Court is granted original jurisdiction in proceedings in mandamus by the Kansas Constitution, art. 3, § 3. This court has consistently recognized that mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that another adequate remedy at law exists. *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 (1984); *Board of Sedgwick County Commr's v. Noone*, 235 Kan. 777, 779, 682 P.2d 1303 (1984); *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 26, 643 P.2d 87 (1982).

Due to its summary and drastic nature, several safeguards have been developed to regulate use of the writ of mandamus. Issuance of the writ is discretionary with the court and a writ should not issue unless a respondent's legal duty is clear. *Huser v. Duck Creek Watershed Dist. No. 59*, 234 Kan. 1, 4-5, 668 P.2d 172 (1983). Mandamus is not available to require performance of an act that involves the exercise of discretion by the public official. This court has stated that "mandamus may not be invoked to control discretion and neither does it lie to enforce a right which is in substantial dispute, and further, that resort to the remedy may be had only when the party invoking it is clearly entitled to the order which he seeks." *Lauber v. Firemen's Relief Assn.*

*of Salina*, 195 Kan. 126, 128-29, 402 P.2d 817 (1965). The only acts of public officials that the courts can control by mandamus are those strictly ministerial, meaning the public officer or agent is required to perform based upon a given set of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion about the propriety or impropriety of the act to be performed. *Arney v. Director, Kansas State Penitentiary*, 234 Kan. 257, 261, 671 P.2d 559 (1983).

Respondents argue that mandamus is not appropriate here because the legislature has given the Commission enormous discretion. Numerous provisions in the statutes delegate broad discretion to the Commission, such as the granting or denial of licenses, K.S.A. 1989 Supp. 74-8813(e). This broad discretion was recognized by this court in *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. at 346.

Although the legislature did give the Commission broad discretion in regulating the racing industry in Kansas, the question presented by this mandamus action does not involve the exercise of that discretion. The question presented is whether the statute requires forfeiture of the deposit submitted with the application for a license. If the statute is interpreted as urged by the attorney general, forfeiture of this deposit will be a ministerial act mandated by the language of the statute and will not involve the exercise of discretion by the Commission.

In many ways this case is similar to *State ex rel. Stephan v. Smith*, 242 Kan. 336, 347-49, 747 P.2d 816 (1987), which was an original action in mandamus against two judges regarding their orders establishing rules and panels for indigent defense services. The judges argued that they were merely exercising their broad discretion in appointing attorneys to represent indigent defendants. This court recognized that the regulations concerning appointment of counsel in criminal cases gave the trial court broad discretion but also contained several nondiscretionary duties. The issue before the court was whether the statutory and regulatory requirements concerning appointment of counsel for criminal defendants were constitutional and enforceable. We concluded that the mandamus action, which sought an interpretation of the law to guide public officials and concerned a matter of great public

importance statewide, was an appropriate and a proper means for presenting the issues raised.

Similarly, although the Commission here was given broad discretion by the legislature, the attorney general's interpretation of the statute would require forfeiture of this deposit without involving the exercise of the Commission's discretion. The issue is whether the language of this statute places a ministerial duty on the Commission to forfeit the deposit once the license is issued regardless of the reasons why a racetrack facility is not built. This concerns a matter of public importance and of statewide interest because of the racing Commission's ongoing efforts to regulate the racing business in Kansas. We conclude that mandamus is an appropriate and proper means to decide this issue and interpret the law to guide the Commission in the performance of its duties.

We turn to the issue of whether K.S.A. 1989 Supp. 74-8815(d) requires forfeiture of the $250,000 deposit once a license is issued, but a racetrack is not completed. The issue presented by the attorney general requires this court to interpret the provisions of K.S.A. 1989 Supp. 74-8815(d). The pertinent part of the statute provides:

"If an applicant for a facility owner license is proposing to construct a racetrack facility, such applicant, at the time of submitting the application, shall deposit with the commission, in such form as prescribed by rules and regulations of the commission, the sum of . . . (2) $250,000, if such number of racing days applied for is less than 150 days; . . . . If the application is denied by the commission, the deposit, and any interest accrued thereon, shall be refunded to the applicant. If the license is granted by the commission in accordance with the terms of the application or other terms satisfactory to the applicant, the deposit, and any interest accrued thereon, shall be refunded to the licensee upon completion of the racetrack facility in accordance with the terms of the license. *If the licensee fails to complete the racetrack facility in accordance with the terms of the license, the deposit, and any interest accrued thereon, shall be forfeited by the applicant.*" (Emphasis added.) K.S.A. 1989 Supp. 74-8815(d).

This same language is contained in K.S.A. 1989 Supp. 74-8813(b), regulating issuance of an organization license for a nonprofit organization.

Because we are required to construe the language of K.S.A. 1989 Supp. 74-8815(d), we will first summarize the rules of statutory construction.

The interpretation of a statute is a question of law. The function of the court is to interpret the statute, giving it the effect intended by the legislature. *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984). The cardinal rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature govern when the intent can be ascertained from the statute. *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987); *In re Estate of Estes*, 239 Kan. 192, 194-95, 718 P.2d 298 (1986); *Kansas Krude Oil*, 236 Kan. at 455.

In construing statutes, the legislative intent must be determined from a general consideration of the entire act. If possible, effect must be given to all provisions of the act, and different provisions must be reconciled in a way that makes them consistent, harmonious, and sensible. *Adee*, 241 Kan. at 829; *Estes*, 239 Kan. at 195. The language of a statute that is designed to protect the public must be construed in light of the legislative intent and is entitled to a broad interpretation so that its public purpose may be fully carried out. Furthermore, a construction that makes part of the legislative act surplusage should be avoided if reasonably possible. *Adee*, 241 Kan. at 829.

In determining legislative intent, we may look at the purpose to be accomplished, the necessity and effect of the statute, and the effect the statute may have under the various constructions suggested. *Estes*, 239 Kan. at 195; *Kansas Krude Oil*, 236 Kan. at 458; *Jackson v. City of Kansas City*, 235 Kan. 278, 319, 680 P.2d 877 (1984). A statute should not be given a construction that leads to uncertainty, injustice, or confusion if possible to construe it otherwise. Words and phrases used in a statute should be construed according to context and the approved usage of the language, which means that words in common use are to be given their natural and ordinary meaning. *Jackson*, 235 Kan. at 319.

The Commission notes that, in *Weinzirl v. The Wells Group, Inc.*, 234 Kan. 1016, 1018, 677 P.2d 1004 (1984), this court recognized that neither the district court nor the appellate court may substitute its judgment for that of the administrative tribunal.

Usually, the legal interpretation of a statute by an administrative board or agency that is charged by the legislature with the authority to enforce the statute is entitled to great judicial de-

ference. Ordinarily, the court will give deference to the agency's interpretation of the law, but, when reviewing questions of law, the trial court may substitute its judgment for that of the agency. *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 809, 667 P.2d 306 (1983). In *Kansas Ass'n of Public Employees v. Public Employees Relations Bd.*, 13 Kan. App. 2d 657, 659, 778 P.2d 377 (1989), the Court of Appeals recently held that an agency's interpretation of a challenged statute may be entitled to *"controlling significance* in judicial proceedings" (citing *Pittsburg State*, 233 Kan. at 809).

This court has recognized that, when a statute is ambiguous, the interpretation placed upon it by an administrative agency whose duties are to carry the legislative policy into effect should be given great weight and may be entitled to controlling significance when the scope and limitations of the powers of the agency must be determined in judicial proceedings. *Cities Service Gas Co. v. State Corporation Commission*, 192 Kan. 707, 714, 391 P.2d 74 (1964); *Southwestern Bell Telephone Co. v. Employment Security Board of Review*, 189 Kan. 600, 607, 371 P.2d 134 (1962).

In response to arguments that this court must construe K.S.A. 1989 Supp. 74-8815(d), the attorney general recognizes that statutory construction is a matter of law and that a statute should be given the effect intended by the legislature, *Kansas Krude Oil*, 236 Kan. at 455, but argues that the statute here is plain and unambiguous and needs no judicial construction. The seventh sentence of K.S.A. 1989 Supp. 74-8815(d) clearly provides that, if the licensee "fails to complete the racetrack facility in accordance with the terms of the license," the deposit shall be forfeited. The attorney general notes that "[n]o legislative history or extrinsic evidence of how the act evolved is necessary or relevant where the act contains no unrelated or unworthy matters and is clear on its face." *State ex rel. Stephan v. Board of Lyon County Comm'rs*, 234 Kan. 732, 740, 676 P.2d 134 (1984).

Let us examine the arguments of respondents in light of the attorney general's position and the rules of statutory interpretation as herein summarized.

The Commission argues that the provisions of K.S.A. 1989 Supp. 74-8815(d) required a "forfeiture," which is a divestment

of property without compensation imposed as a consequence of a default or an offense which is provided by the legislature to restrain the commission of the offense and to aid in its prevention. 36 Am. Jur. 2d, Forfeitures and Penalties § 1. The following rules of statutory construction apply when construing a forfeiture statute:

"It is a generally accepted rule of law that forfeitures are not favored; they are considered harsh exactions, odious and to be avoided when possible. A statute imposing a forfeiture should be construed strictly and in a manner as favorable to the person whose property is to be seized as is consistent with fair principles of interpretation. Courts will not search for a construction to bring about a forfeiture, nor will a constrained construction be indulged in order to create a forfeiture. For a statute to be construed so as to work a forfeiture, its language must clearly show such an intent, and forfeiture is never to be inferred from doubtful language. Courts will not force upon a forfeiture statute a construction which amounts to a reading into the law provisions not inserted therein by the legislature. (37 C.J.S. 8 to 10; 23 Am. Jur. 601-602.)" *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 360, 226 P.2d 263 (1951).

Because K.S.A. 1989 Supp. 74-8815(d), as interpreted by the attorney general, would require Sunflower to forfeit its deposit, the statute must be interpreted as favorably toward Sunflower as is consistent with fair principles of interpretation. To find that the statute requires forfeiture of this property, its language must clearly show the legislature intended to impose a forfeiture under the facts of this case.

The Commission further argues that, when the interpretation of one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, even though that requires disregarding the strict letter of the law.

The Commission here argues that other provisions of the statute show the legislature could clearly require forfeiture of a fee if it intended to do so. In K.S.A. 1989 Supp. 74-8815(c), the legislature specified that the $5,000 application fee would be non-refundable and provided that a license would not issue until the applicant paid any additional costs incurred in the investigation.

Alternatively, in subsection (d) of 74-8815, the legislature merely required the applicant to deposit a sum of either $250,000

or $500,000, depending upon the number of racing days antici-
pated. The legislature did not refer to this deposit as "nonre-
fundable." Nor did the legislature specify that the deposit "shall
not be refundable except" in certain situations. Instead, the Com-
mission argues that the legislature included the seventh sentence
of 74-8815(d) to avoid "half-finished racetracks in wheat fields."

The Commission further argues that use of the phrase "fails to
complete" could have a variety of meanings. The Commission
asserts that the legislature was concerned about a licensee be-
ginning construction of a racetrack but leaving it "half-finished in
wheat fields." The Commission argues that these concerns are
not applicable when a conditional license is granted but construc-
tion never begins because the conditions required by the license
are not fulfilled. Here, the Commission granted a conditional
license to Sunflower requiring, among other things, that Sun-
flower present an acceptable plan for financing construction of
the racetrack. The Commission rejected the plan presented by
Sunflower. This occurred before Sunflower began construction of
the racetrack. The Commission and Sunflower urge this court to
interpret the phrase "fails to complete" to apply to those cases
in which actual construction of the racetrack begins.

In support of their position, Sunflower and the Commission
argue that the license granted to Sunflower contained several
conditions precedent that had to be performed before actual con-
struction of the racetrack was to begin. The parties argue that
the phrase "in accordance with the terms of the license" requires
that the license issued to Sunflower be incorporated into the
seventh sentence of subsection (d) of 74-8815. They argue that,
because the license was conditional and the conditions were not
met, the licensee, Sunflower, did not fail under the terms of the
license and, therefore, the deposit cannot be forfeited. We fail
to see the merits in this argument. All regulatory licenses issued
by the State are conditional because the licensee must meet
certain standards and obligations. Various sanctions are imposed
for a failure to meet those obligations and standards. Here, the
consequences for failing to meet the conditions imposed by the
Commission are not at issue. At issue is the consequence for

failing to construct the racetrack after the license was issued. That consequence is the forfeiture of the $250,000 deposit.

Sunflower argues that it complied with all the requirements of the condition by presenting its financial loan documents prior to July 31. The Commission agrees that Sunflower met its requirements, but the Commission refused the loan proposal. Because the Commission did not accept this loan proposal, the conditions of the license were never met, and Sunflower never became obligated to begin construction of the racetrack. In other words, under the conditional license, Sunflower was never obligated to begin construction until the conditions precedent were fulfilled, including approval of the financing proposal.

Although the Commission was unable to cite any Kansas cases dealing with the refund of a licensing fee in a case such as this, the Commission argues that the law concerning conditions precedent in contracts is analogous and applicable to conditional licenses, and should apply to the case at hand. We do not agree. We are not dealing with a contract but with a license created by statute.

We find no support for respondents' arguments in the legislative history of K.S.A. 1989 Supp. 74-8815(d). The initial draft, which was prepared by a staff attorney for the Kansas Department of Revenue, did not contain a deposit requirement as appears in 74-8815(d). A subsequent draft by the nine-member State Task Force on Parimutuel also contained no deposit requirement. This draft was included in the report of the State Task Force on Parimutuel to the governor. Language that required an advance deposit of taxes and license fees and a definite financing commitment to be included with an application for a facility manager license was added as the bill worked its way through the committees in both houses of the legislature. The provisions contained in K.S.A. 1989 Supp. 74-8815(d) that this court must interpret in this case were added by a conference committee during the final hours of the legislative process, resulting in enactment of the racing act. Sen. J. 1987, pp. 795-96. There is no documentation of the legislature's intent in amending this subsection and adding the sentences at issue here.

Sunflower, however, argues that the statute does not clearly create a ministerial duty to forfeit the deposit in this case because

the legislature gave the Commission such broad discretion in controlling racing in Kansas. Sunflower reasons that this grant of great discretion shows the legislature's intent to allow the Commission an inherent right to control licensing under the racing act, including the right to ask that a license be returned in a case such as this.

To support its argument, Sunflower points to the interpretation of the act in *Kansas Racing Management, Inc. v. Kansas Racing Comm'n,* 244 Kan. at 358. This court held that the provisions enacted by the legislature did not create a liberty or property interest in an *application* for a license. Once a facility owner license or a facility manager license is issued, the holder of that license has a property right and has a protected right to notice and a due process hearing if the Commission refuses to renew the license. K.S.A. 1989 Supp. 74-8815(l). In some instances, an application for licensure may rise to the level of a constitutionally protected property or liberty interest where state laws require a license to be conferred if an applicant meets specific minimum requirements. The Kansas Parimutuel Racing Act creates no entitlement. Licenses are not issued to all who meet prescribed standards but, instead, are discretionary with the Commission. This court stated: "The legislature intended that, even where one or all of the applicants meet the requirements, the Commission has discretion to withhold a license." 244 Kan. at 358. Regarding the discretion given to the Commission by the legislature, this court stated:

"It must be remembered that the legislature delegated to the Commission the task of selecting licensees from a group of qualified applicants. The legislature presumably vested the Commission with the sole discretion for issuing licenses because of the expertise it possesses in this area. In performing this task, the Commission had to balance many competing interests, which we cannot reweigh on appeal. It would have been easier for this court to review the decision below had the Commission's order provided a more detailed reasoning for its choice. However, it is clear that the Commission found the personal investment of $12.9 million by the principal shareholders of Sunflower and the proposed dual racetrack facility to be important factors in the licensing decision." 244 Kan. at 369.

Sunflower reasons that, in light of the sole discretion the legislature placed with the Commission to determine whether a license should be issued at all, a concomitant authority and dis-

cretion must exist to allow the Commission to seek return of a license if the circumstances change. However, assuming Sunflower's reasoning to be correct, it would not follow that such concomitant authority and discretion would include the refunding of the deposit. Sunflower notes that a person who has been granted a license is entitled to notice and a due process hearing if the Commission seeks to revoke the license, but Sunflower concedes that it makes no protest about the procedure used by the Commission in asking that the license be returned. Nor does it follow that the Commission has the authority to refund the deposit because it has the authority to seek a return of the license.

Finally, Sunflower offers two alternative theories to support the Commission's refunding of the deposit. First, Sunflower argues that the terms of the license excused Sunflower's performance when the attempts to secure financing failed. Sunflower argues that the statute does not create a clear, ministerial duty for the Commission to forfeit the deposit but, instead, contains a negative implication that the deposit should be returned unless Sunflower's failure to complete the racetrack is a breach of terms of the license. As support, Sunflower notes cases that hold a court cannot supply what appears to be an omission to a statute even though the question was never contemplated by the legislature. *State v. Wood*, 231 Kan. 699, 702-03, 647 P.2d 1327 (1982) (when terms of habitual violator statute specify inclusion of violations of city ordinance under the subsection relating to DUI, city ordinance convictions of other violations listed in the statute would not be counted toward the three convictions necessary to make the person a habitual violator). If the attorney general were attempting to collect a deposit or to force Sunflower to perform under the contract, then this theory might have merit. Here, the State has a $250,000 deposit, and the legislature specifically addressed what was to happen to the deposit in the event the racetrack was not completed.

Next, Sunflower argues that the doctrine of commercial frustration relieves Sunflower of its obligation to perform under the contract. Before making this argument, Sunflower makes clear its belief that the Commission drafted the license in anticipation of litigation problems and relieved Sunflower of its obligation to build the track in this case. But if the court rejects this position,

Sunflower alternatively argues that it should be relieved of its obligation to perform under the contract because the events causing frustration of the contract were neither reasonably foreseeable nor capable of being controlled. To apply this doctrine, Sunflower urges this court to find that Sunflower could not reasonably foresee and was not capable of controlling the litigation by the rejected applicants, which caused delay in obtaining financing and resulted in Sunflower's original financier's backing out.

Sunflower directs this court to *State Highway Construction Contract Cases*, 161 Kan. 7, 66-67, 166 P.2d 728 (1946), which involved an attempt by several construction companies to have their contracts with the State Highway Commission cancelled on grounds of impossibility of performance due to hardships and increased prices incidental to our country's involvement in World War II. The court rejected the argument, finding that the evidence established the work could be done, although it would take longer and cost more. 161 Kan. at 67. The court quoted the controlling rule as follows:

" 'The doctrine of commercial frustration is predicated upon the premises of giving relief in a situation where the parties could not reasonably protect themselves by the terms of a contract against the happening of subsequent events, but it has no application to a situation where the event that has supervened to cause the alleged frustration was reasonably foreseeable and could and should have been controlled by provisions of such contract.' " 161 Kan. at 66 (quoting *Berline v. Waldschmidt*, 159 Kan. 585, Syl. ¶ 2, 156 P.2d 865 [1945]).

The doctrine of commercial frustration is not applicable here. Sunflower notes in its brief that it anticipated the possibility of litigation. Furthermore, the license issued by the Commission anticipated litigation. Even though litigation was anticipated, and thus reasonably foreseeable by the parties, Sunflower entered into the contract. The statute provides for the granting of continuances and, as previously mentioned, are not limited in number or length.

We conclude that the provisions of K.S.A. 1989 Supp. 74-8815(d) are clear and unambiguous. The statute mandates that the $250,000 deposit shall be forfeited if the licensee fails to complete the racetrack facility. The legislature chose not to differentiate between a conditional and an unconditional license, nor

did it make any exceptions to the forfeiting of the deposit in the event the racetrack facility was not completed.

We concur with the attorney general that the respondent Commission had no authority or discretion to return the deposit. Sunflower Racing, Inc., was granted the license and, because it failed to complete the racetrack facility, the deposit was forfeited pursuant to K.S.A. 1989 Supp. 74-8815(d).

The petition for mandamus is granted. The respondent Kansas Racing Commission is ordered to rescind the orders directing the return of the $250,000 deposit to Sunflower Racing, Inc., and to order said money and any interest accrued thereon forfeited by operation of law.